[No. B119881. Second Dist., Div. Two. Oct. 14, 1999.]

IAN C. BINDER, Plaintiff and Appellant, v.
AETNA LIFE INSURANCE COMPANY et al., Defendants and
Respondents.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts V. and VI.

**COUNSEL**

Berry & Perkins, James H. Berry, Jr., and W. Paul Baskett for Plaintiff and Appellant.

Morrison & Foerster, B. Scott Silverman and Michael S. Chamberlin for Defendants and Respondents.

**OPINION**

**ZEBROWSKI, J.**—Plaintiff employee sued defendant employer for 1) breach of an implied-in-fact contract not to terminate except for "good cause," and 2) age discrimination. The trial court granted summary judgment for the defendant employer. The plaintiff employee appeals.

The evidence suggests a strong possibility, perhaps a strong likelihood, that a trier of fact would resolve the issues in favor of the defendant employer on the "good cause" termination issue. It is not so clear from the evidence presented, however, that a reasonable trier of fact *would necessarily have to* resolve the issues in favor of the defendant employer. To assist in further development of the issues, we authorized further briefing. Both sides presented skillfully prepared and helpful letter briefs. Although the issue is close, we conclude that the evidence did not conclusively establish that there were no triable issues of material fact regarding the meaning of the parties' implied agreement and whether what the plaintiff employee did amounted to

"good cause" to terminate within that meaning. In the published portion of this opinion, we will therefore reverse the summary judgment on plaintiff's claim of breach of implied contract.

In the unpublished portion of this opinion, we will conclude that the defendant employer's summary judgment motion did not negate plaintiff's prima facie case of age discrimination. Hence we will also reverse the summary judgment on that claim.

I.   *Summary judgment standards.*

a.   *How the evidence must be viewed.*

Since this appeal follows the granting of summary judgment, the evidence must be examined according to summary judgment standards.  ■  Examining evidence in light of summary judgment standards is far different from applying the substantial evidence test that often governs on appeal. In the judgment after trial context the evidence need only be sufficient to support the judgment for the winning party, even though the evidence might, in another reasonable mind, also have supported a judgment for the losing party. In the summary judgment context, by contrast, the evidence must be incapable of supporting a judgment for the losing party in order to validate the summary judgment. Thus even though it may appear that a trial court took a "reasonable" view of the evidence, a summary judgment cannot properly be affirmed unless a contrary view would be unreasonable as a matter of law in the circumstances presented.

In part II, we summarize the evidence in light of the applicable summary judgment standards. In this section, we describe the principles of summary judgment law which dictate how we must view the evidence at this procedural juncture.

■  Although summary judgment might no longer be considered a "disfavored" procedure, (see, e.g., Henley, Action Guide, Making and Opposing a Summary Judgment Motion (Cont.Ed.Bar 1998) p. 15; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 1999) ¶ 10:278, p. 10-108), the rule continues that the moving party's evidence must be strictly construed, while the opposing party's evidence must be liberally construed. "Because of the drastic nature of the summary judgment procedure, and the importance of safeguarding the adverse party's right to a trial, the moving party must make a strong showing. His affidavits are *strictly construed.* . . . [¶] On the other hand, the affidavits of the party opposing the motion are *liberally construed.*" (6 Witkin, Cal. Procedure (4th ed. 1997)

Proceedings Without Trial, § 218, p. 630.) "Reflecting the 'cautious' judicial attitude about granting summary judgment . . . the declarations and evidence offered in opposition to the motion *must* be *liberally* construed, while the moving party's evidence must be construed *strictly*, in determining a 'triable issue' of fact." (Weil & Brown, *supra*, ¶ 10:309, p. 10-114.)

On a summary judgment motion, the court must therefore consider what inferences favoring the opposing party a fact finder could reasonably draw from the evidence. While viewing the evidence in this manner, the court must bear in mind that its primary function is to identify issues rather than to determine issues. (Cf., e.g., Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶ 10:270, p. 10-105 [citing cases].) Only when the inferences are indisputable may the court decide the issues as a matter of law. If the evidence is in conflict, the factual issues must be resolved by trial. "Any doubts about the propriety of summary judgment . . . are generally resolved *against* granting the motion, because that allows the future development of the case and avoids errors." (Henley, Action Guide, Making and Opposing a Summary Judgment Motion, *supra*, at p. 15.)

■ A defendant can qualify for summary judgment by showing that an element of plaintiff's cause of action cannot be established. (Code Civ. Proc., § 437c, subd. (o)(2); see also, e.g., Weil & Brown Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶ 10:240, p. 10-85.) In the instant case, plaintiff is suing for breach of contract. The elements of plaintiff's cause of action therefore include contract formation and breach. (See, e.g., *Roddenberry* v. *Roddenberry* (1996) 44 Cal.App.4th 634, 654-655 [51 Cal.Rptr.2d 907] [plaintiff seeking contract recovery must plead and prove contract formation and breach].) Defendant here could therefore qualify for summary judgment by demonstrating, on the basis of undisputed facts, either a lack of contract formation or a lack of breach.

In the context of a "good cause" contract which is only implied by conduct over a period of time, formation and breach cannot always be temporally and otherwise neatly distinguished. Issues of contract formation and contract breach consequently tend to meld together. If an employee is fired for a particular cause, the employer might argue that the parties never formed a contract agreeing not to terminate for that particular cause (thus attacking the contract formation element). Or the employer might argue that the parties' contract classifies the particular cause in question as "good cause" (thus attacking the breach element). Either argument, if factually supported, defeats the plaintiff's breach of contract claim.

Even though plaintiff bears the burden of proof at trial, a moving defendant bears the initial burden of showing the lack of any triable factual issue.

(See, e.g., *Pieper* v. *Commercial Underwriters Ins. Co.* (1997) 59 Cal.App.4th 1008, 1015 [69 Cal.Rptr.2d 551] ["The moving defendant bears the burden of proving the absence of any triable issue of material fact, even though the burden of proof as to a particular issue may be on the plaintiff at trial."].) A responding plaintiff has no evidentiary burden unless the moving defendant has first met its initial burden. (See, e.g., Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶ 10:249, 10:261, pp. 10-93, 10-99) Only after the moving defendant meets its initial burden does the burden shift to the plaintiff to demonstrate the existence of a triable issue. (See, e.g., *Pieper*, *supra*, at p. 1015.) Hence, in a motion such as the one involved here, the court must initially determine whether the moving party has presented evidence establishing that the contractual terms claimed by plaintiff never came into existence, or in the alternative has presented evidence establishing that the contractual terms that did come into existence were never breached.

■ The trial court may not weigh the evidence in the manner of a fact finder to determine whose version is more likely true. (See, e.g., Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶ 10:272, pp. 10-105 to 10-106.) Nor may the trial court grant summary judgment based on the court's evaluation of credibility. (See, e.g., Weil & Brown, *supra*, ¶ 10:272.10 et seq, p. 10-107 et seq. [citing cases].) Nor may the trial court grant summary judgment for a defendant based simply on its opinion that plaintiff's claims are "implausible," if a reasonable factfinder could find for plaintiff on the evidence presented. (But see, e.g., Weil & Brown, *supra*, ¶ 10:260.10 et seq., p. 10-97 et seq. [discussing and distinguishing substantive "implausibility" limitations on permissible inferences from circumstantial evidence in federal antitrust law].)

The court must consider not only the bare evidence, but also the reasonable inferences deducible from the evidence (see, e.g., Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶ 10:302, p. 10-112), and determine whether the evidence is sufficient to support a potential judgment in favor of the opposing party. (See, e.g., Weil & Brown, *supra*, ¶ 10:260, p. 10-97; *Rio Linda Unified School Dist.* v. *Superior Court* (1997) 52 Cal.App.4th 732, 739 [60 Cal.Rptr.2d 710] ["Under the new method for establishing a prima facie entitlement to summary judgment, the moving party must demonstrate a negative, i.e., that there *is no* evidence to support an element of the opponent's case. This is akin to the burden of an appellant in proving there is no substantial evidence in support of a judgment."]; cf. *Anderson* v. *Liberty Lobby, Inc.* (1986) 477 U.S. 242, 247-248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] [applying federal law; ". . . summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party"].)

In view of these principles, we state the facts in part II below in the manner in which the evidence would permit the facts to be decided most favorably to the plaintiff.

    b.  *Whether "good cause" can be determined on a summary judgment motion.*

■ Plaintiff contends that the existence or absence of good cause to terminate is inherently an issue of fact which cannot be decided on summary judgment. The cases, however, hold otherwise. As a general matter, "[l]ike other civil causes of action, wrongful discharge claims arising in contract or in tort may be susceptible of pretrial disposition on motions for summary judgment." (*Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252 [32 Cal.Rptr.2d 223, 876 P.2d 1022].) Plaintiff in *Fowler* v. *Varian Associates, Inc.* (1987) 196 Cal.App.3d 34, 42 [241 Cal.Rptr. 539] also argued "that the existence of 'good cause' cannot be determined on a motion for summary judgment." The *Fowler* court ruled that the plaintiff's "argument is not correct. (See, e.g., *Clutterham* v. *Coachmen Industries, Inc.* (1985) 169 Cal.App.3d 1223, 1227 [215 Cal.Rptr. 795]; *Crosier* v. *United Parcel Service, Inc.* (1983) 150 Cal.App.3d 1132, 1140 [198 Cal.Rptr. 361].)" (*Fowler, supra,* 196 Cal.App.3d at p. 42-43.) The court in *Fowler* ultimately held that "[u]ndisputed facts establish that [the employer] had good cause to discharge Fowler." (*Id.* at p. 40.) Similarly, in *Knights* v. *Hewlett Packard* (1991) 230 Cal.App.3d 775, 780 [281 Cal.Rptr. 295], the court ruled that "[w]hether Knights' performance was unacceptable and whether good cause for discharge existed are issues that may be determined on a summary judgment motion. (*Fowler* v. *Varian Associates, Inc., supra,* 196 Cal.App.3d 34, 42-43.)" (See also *Moore* v. *May Dept. Stores Co.* (1990) 222 Cal.App.3d 836 [271 Cal.Rptr. 841] [trial court correctly concluded that on facts presented there was good cause, as a matter of law, to terminate appellant]; cf. *Gonzales* v. *MetPath, Inc.* (1989) 214 Cal.App.3d 422 [262 Cal.Rptr. 654] [summary judgment upheld in discrimination case].)

Hence summary judgment can properly be granted for a defendant employer on a "good cause" issue.

    II.  *Factual and procedural background.*[1]

Plaintiff and appellant Ian C. Binder was employed by Aetna for 30 years. At the time of his termination, plaintiff managed Aetna's Life Insurance

---

[1]We emphasize that a fact finder would not necessarily have to find the facts as stated here, and we make no suggestion about how a fact finder should resolve the disputed factual issues. However, since a fact finder *could*, on the evidence presented, reasonably find the facts to be as stated here, and since this set of facts leaves open the possibility of a supportable plaintiff's judgment, summary judgment should have been denied.

The evidence described here relates primarily to plaintiff's claim of breach of an implied contract not to terminate except for good cause. Additional evidence bearing on plaintiff's

Career Agent Unit in Encino, where he supervised about 10 life insurance sales agents. He had been employed in similar management positions with Aetna for about 15 years. He had an unblemished service record, and Aetna admitted that plaintiff was performing his job satisfactorily at the time of his termination. Prior to the Rancho Bernardo "invoice" incident (described below), Aetna had no reason to doubt plaintiff's honesty and integrity.

In November 1993, Aetna's national sales manager announced a "Vice President's December Challenge Award." Pursuant to this award program, sales managers who met a specified sales goal for the month of December would "win" an excursion to a resort of their choice with a spouse or significant other, in the form of reimbursement of up to $300 for such purpose. Plaintiff was one of four out of eleven managers who qualified, and hence became entitled to a $300 "bonus." The $300 bonus was earned compensation. This was proven by several factors. For example, these bonuses were to be $300 net, with the employee's taxes paid separately by the company so that the "checks will net $300," and the amount of the bonus was to be included in total income for purposes of pension calculations.

In January 1994, Aetna reorganized its field offices and reduced its "General Manager" positions from 11 to 7. Three individuals competed for the one position available in California: plaintiff, age 55, and two 42-year-olds. Despite what plaintiff claims to be his superior qualifications, one of the 42-year-old candidates was selected. Plaintiff was offered two alternatives: a severance package worth about $170,000 over nineteen months, or a new, potentially more lucrative, employment arrangement with compensation based largely on performance bonuses. Plaintiff preliminarily opted for the new arrangement, subject to a completed agreement on the details of the performance bonus program.

Prior to the time of the reorganization, plaintiff understood that his immediate supervisor was a senior Aetna executive named Westley Thompson. It was Mr. Thompson with whom plaintiff was negotiating the new performance bonus program, and who had offered him the alternative severance package. In March, 1994, however, Mr. Thompson left Aetna, with the details of the performance bonus program still unresolved and with the severance package offer still open.

In early 1994, plaintiff was contacted by a Connecticut-based Aetna executive named John Jones. Mr. Jones advised plaintiff that he, Mr. Jones, had really been plaintiff's supervisor for the preceding period, and ordered

claim of age discrimination is discussed in the unpublished portion of this opinion dealing with the age discrimination issue.

plaintiff to commence Aetna's periodic performance review process. According to Mr. Jones, this involved plaintiff's initially writing his own performance review, to be reviewed and adjusted as appropriate by Mr. Jones. Plaintiff took issue with this process, contending among other things that plaintiff had understood that Mr. Thompson, not Mr. Jones, was his supervisor. In particular plaintiff contended that Mr. Jones, remotely officed, did not have sufficient familiarity with plaintiff's work performance to enable Mr. Jones to fairly evaluate plaintiff. A confrontation between plaintiff and Mr. Jones escalated to a heated exchange, and to subsequent disagreements over the content of plaintiff's performance review.

In March 1994, Mr. Jones traveled to Encino and, "man to man," asked plaintiff why they did "not get along." Plaintiff opined that the reason was that Mr. Jones saw everything in black and white, while plaintiff saw "a lot of gray." Plaintiff further opined that this situation was the product of Mr. Jones's military training. Mr. Jones thereupon "went ballistic and started yelling and screaming" and said "[e]verybody says that. It's not correct, and I resent that." The discussion became so heated that plaintiff chose to leave his own office. The relationship between plaintiff and Mr. Jones deteriorated from there. These events caused Mr. Jones to want to terminate plaintiff, but he had no legitimate reason to do so. When the Rancho Bernardo "invoice" incident (described below) occurred, Mr. Jones seized upon it as a justification for terminating plaintiff, although his true reasons were simply his personal dislike for plaintiff.

In January 1994, plaintiff's home was badly damaged or destroyed in the Northridge earthquake. For the next several months, as some of the events described above unfolded, plaintiff and his wife lived with relatives and friends. After two months of such living arrangements, plaintiff decided to use his $300 bonus for a private weekend away with his wife. He rented a condominium in Redondo Beach for $500 in cash. However, the owner of the condominium did not provide a receipt because he did not want to report rental income for tax purposes.

Plaintiff then committed the error which now forms the asserted "good cause" for termination of his 30-year employment. Having spent more than the $300 bonus he had already earned, but having no receipt, plaintiff prepared a Rancho Bernardo Inn letterhead in the form of an invoice, complete with entries for room charges, food charges, tax charges, a notation of payment by check, etc. He then submitted this document in order to trigger payment of his previously earned bonus. It is undisputed that this Rancho Bernardo "invoice" was a fabrication, and that plaintiff and his wife had not stayed at the Rancho Bernardo Inn. The flagrancy of the fabrication is perhaps heightened by the detail which the "invoice" contains.

Later, in mitigation of his conduct, plaintiff pointed out that he was in fact entitled to a $300 bonus, and that he had never claimed from Aetna any sum to which he was not entitled. Despite Aetna's attempt to so characterize it, plaintiff had not submitted a falsified expense account claim. He was instead attempting to collect an earned bonus. Plaintiff contended that he had taken the weekend of relaxation as the bonus program contemplated by renting the condominium in Redondo Beach for $500, and hence was fully entitled to the money. Aetna identified no instance in which an award winner had not collected his prize, raising the inference that Aetna fully expected to pay the award in any event. Moreover, Aetna acknowledged that Aetna was indifferent as to where plaintiff and his wife took their weekend. Aetna identified no damage to it from the inaccurate reporting of where plaintiff had taken his weekend.

Even before plaintiff learned that Aetna had instituted an investigation into the bona fides of the Rancho Bernardo "invoice," plaintiff realized he had made a mistake. He decided to withdraw the "invoice." He asked for its return, and was told it would be returned. Plaintiff planned instead to take extra time after an Aetna sales meeting at Hilton Head, and then to submit the invoices from the extended Hilton Head stay to collect his previously earned bonus.

Mr. Jones, however, determined that he now had a plausible reason to terminate plaintiff. Mr. Jones contended that the Rancho Bernardo "invoice" constituted "the fraudulent submission of an expense account," that it was "fabricated" and an attempt "to deceive management," and that it "constituted unethical conduct." He purported to order an investigation into the bona fides of the "invoice." In his memo to an Aetna internal security auditor initiating the investigation, however, Mr. Jones advised the auditor that plaintiff was "a difficult manager who routinely questions management practices and decisions." Mr. Jones also told the internal security auditor that plaintiff was a "difficult employee to manage, challenges raises, bonus awards, merit increases, etc." The disconnection between Mr. Jones's comments and the purportedly limited subject at hand—the bona fides of the Rancho Bernardo "invoice"—suggests an inference that it was a foregone conclusion to Mr. Jones that plaintiff would be terminated due to Mr. Jones's dislike of plaintiff, and that the investigation was not intended to be an objective effort to evaluate the facts and seriousness of the incident.

Aetna's "Code of Conduct" is cited by Aetna itself as defining at least some of the terms of plaintiff's implied contract of employment. Plaintiff points out that this code provides that "[e]mployees are responsible for . . . questioning what they don't understand or don't agree with," and for "providing feedback to the manager on the manager's performance in planning,

coaching, reviewing and developing the employee . . . ." The conduct of plaintiff criticized by Mr. Jones, therefore, is arguably conduct authorized or even required by Aetna's own code. Moreover, despite his initial comments to Aetna's internal auditor, Mr. Jones later testified at deposition that "my view of [plaintiff's] performance didn't change. His performance was immaterial to all this. His performance was fine." Jones also later stated that plaintiff's alleged assertiveness had "nothing, zero, nada" to do with the issue of the Rancho Bernardo "invoice." Mr. Jones nevertheless featured his opinion of plaintiff as "difficult," etc., prominently in his communications with the Aetna internal investigator.

Mr. Jones also ordered an audit of plaintiff's actual expense account reports, as contrasted with the Rancho Bernardo "invoice" submitted to obtain payment of an earned bonus. The audit showed no irregularities.

On May 11, 1994, plaintiff received a termination letter from Aetna stating that he was being terminated for "unethical conduct." Aetna's Code of Conduct, generally alleged by Aetna itself to make up part of the implied contract between Aetna and plaintiff, defines "unethical conduct" by stating that either a one-time warning or immediate termination is justified for "unethical conduct: e.g., conduct which has caused a supervisor to question the employee's honesty and lose confidence in his/her ability to do the job . . . ." (Underlining in original.) Although Mr. Jones testified that he questioned plaintiff's honesty after the Rancho Bernardo "invoice" incident, there was no evidence that any supervisor had lost confidence in plaintiff's ability to do his job. To the contrary, this entire lawsuit exists only because plaintiff had done his job so well that he was one of four out of eleven eligible employees who had qualified for a bonus based on good performance. Had plaintiff performed more poorly, he would never have qualified for the bonus, would not have had the opportunity to engage in the misguided conduct which lead to his termination, and perhaps would still be employed. Moreover, Aetna admitted that plaintiff was performing satisfactorily at the time of his termination. Hence Aetna's stated reason for the termination—"unethical conduct"—did not coincide with the definition of "unethical conduct" in the manual which Aetna itself contends constituted part of the parties' implied contract.

The termination letter further stated: "More specifically, your employment termination is based on your admission that you provided a fraudulent hotel bill to management for reimbursement." To the extent that this language was meant to suggest "reimbursement" of a business expense, rather than "payment" of an earned bonus, it is inaccurate. To the extent that this language was meant to suggest that the submission was "fraudulent" in the sense that

plaintiff was attempting to obtain money to which he was not entitled, rather than to obtain payment of a bonus to which he was entitled, it is also inaccurate. Although the language of the termination letter may be consistent with Mr. Jones's initial characterization of the Rancho Bernardo "invoice" incident as "the fraudulent submission of an expense account," the facts are indisputable that plaintiff's actions—no matter how misguided—were not an attempt to obtain reimbursement of a business expense, but rather an attempt to obtain payment of an earned bonus.

No one other than Mr. Jones was asked about his opinion of plaintiff's honesty during Aetna's investigation, even though Mr. Jones's familiarity with plaintiff was limited. Plaintiff had never been accused of anything similar in the past, and Aetna's investigation showed that the Rancho Bernardo "invoice" incident was an isolated event. Aetna gave no consideration to plaintiff's interest in continued employment, notwithstanding that plaintiff had worked for Aetna for 30 years and was 55 years of age.

Other evidence bearing on the questions of what contract had impliedly been formed and whether Aetna had breached it suggested that no one previously had been terminated for any similar conduct, and that some had been more leniently treated for conduct which was arguably equally serious or, by some standards, even more serious. Aetna contended that it had consulted Aetna's legal department before terminating plaintiff, asking whether a termination would be consistent with Aetna's handling of past disciplinary cases. Aetna contended that it received legal advice that terminating plaintiff would be consistent with past practice, but refused to disclose the precise content of that legal advice or to identify the past instances of allegedly consistent discipline. Plaintiff points out that Aetna's Code of Conduct provides that plaintiff is entitled to equal treatment, and argues that no evidence shows such a drastic penalty applied in any comparable situation.

Aetna also presented evidence that its Code of Conduct provides that "fraud, dishonesty or criminal conduct involving Company operations is prohibited," that "Employees who fail to comply with the policies, procedures and standards in this Code of Conduct . . . are subject to disciplinary action, including possible dismissal or termination of their relationship with Aetna," that "there are situations where employees may be subject to termination without Progressive Discipline," etc. Aetna also presented evidence that its "handbook" entitled Working With You - Employee Handbook of Personnel Policies and Programs, which impliedly comprised part of the parties' implied contract, stated that "[e]mployees whose actions violate company/department policy or are illegal can be immediately terminated."

Plaintiff, however, countered that the handbook also states that "[d]epending on the circumstances, department management may issue a one time warning." Neither party presented any more specific manual provisions or other evidence regarding whether an incident such as that involved here would qualify as good cause notwithstanding factors such as longevity of service, long-standing good performance, continuing good performance at the time of termination, plaintiff's entitlement to the $300 in any event, plaintiff's withdrawal of the "invoice" before processing, etc., or whether these are the type of "circumstances" which would require "a one time warning." Plaintiff did present evidence that Aetna's stated policies concerning reimbursement of business expenses did not apply to the payment of earned bonuses.

Plaintiff also presented evidence that the application for payment by another winner of the vice-president's December Challenge Award had been sent into processing without any invoices submitted, instead subject only to the submission of invoices later.

Plaintiff also presented evidence of Aetna's handling of the Zoe Baird incident, arguing that Aetna's treatment of this incident evidenced a practice of not hewing strictly to the highly moralistic standard applied to plaintiff. For example, after Zoe Baird was reinstated as general counsel for Aetna after her nomination as Attorney General failed amid allegations of tax irregularities, Aetna's chairman stated "I would say to the American public: Let he who is without sin cast the first stone . . . ." Later, an internal memo circulated to Aetna management stating that "Aetna is not prepared to turn its back on an outstanding employee because a few of our customers hold us to a perfection standard that 99% of the population does not meet." Although the Zoe Baird incident is significantly distinguishable from the present incident in that the tax issues involved in the Baird incident involved events occurring outside the workplace, plaintiff implicitly argues that statements such as these contribute to the parties' implied understanding of what would constitute good cause to terminate, and suggest that Aetna would not apply strict moral standards to employee missteps. Plaintiff also contends that the Baird incident undercuts Aetna's claim that it had to terminate plaintiff because it was concerned about how the Rancho Bernardo "invoice" incident would look if it were published in the Los Angeles Times. Plaintiff also emphasizes that his record was, but for the Rancho Bernardo "invoice" incident, unblemished during his entire 30-year career.

Early in the trial court proceedings, the judge remarked: "It's all about fairness. You fire a guy on an absolutely moral standard. . . . Mr. Binder gets fired on a pretty rigid moral standard. I think that this is fair evidence of pretext, fair evidence of good cause, fair evidence of a lot of stuff . . . I do

think it's pertinent evidence and fair evidence about . . . whether Aetna means what it says and says what it means . . . You fired the guy. He was with you for 30 years, and you fired him on a very rigid, very rigid application of a . . . what I think 12 people are going to find a pretty minor point." Nevertheless, despite these initial observations, the trial court later granted summary judgment.

Plaintiff also presented evidence that after his termination, Aetna failed to repay to him $200 Aetna owed him for an airplane ticket and failed to pay him for accrued vacation time, thus suggesting continuing animus toward plaintiff. Despite the previous negotiations between plaintiff and Mr. Thompson, plaintiff received no severance payments.[2]

### III. *Applicable contract law.*

■    The common law of contract controls here. (Cf. *Cotran* v. *Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 108 [69 Cal.Rptr.2d 900, 948 P.2d 412] ["The law of wrongful discharge is largely a creature of the common law."].) In the absence of an implied contract otherwise, Labor Code section 2922 would apply, plaintiff's employment would be "at will," and Aetna could terminate him for any reason or for no reason. For purposes of its summary judgment motion, Aetna conceded that a contract not to terminate except for good cause had been formed. Although each side cited standard statements of the "good cause" concept, each side also cited evidence which assertedly gave particularized content to the particular understanding of these parties. Determining what that particular understanding was requires the application of contract law.

Some cases in the wrongful termination area have been chided on the view that they deviate from contract law.[3] Other cases contain summary passages

---

[2]Aetna's internal manual provides that *"Employees terminated for misconduct are not eligible for severance pay or rehire."*

[3]See, e.g., Justice Kennard, concurring and dissenting in *Cotran* v. *Rollins Hudig Hall Internal., Inc., supra,* 17 Cal.4th 93: "At issue here is the precise meaning or content of the 'good cause' condition of the parties' implied agreement. The majority treats this issue as essentially one of law, without pausing to consider what the parties might have intended. In my view, however, the issue is one of contract interpretation that should be resolved, if possible, by determining what the parties understood their agreement to be when they entered into it. To determine the parties' intent, a court or jury must examine all evidence relating to the formation of the implied agreement." (*Cotran* v. *Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at p. 111 (conc. & dis. opn. of Kennard, J.).)

not expressly linked to contract law.[4] Nevertheless, all the cases are consistent with long-settled principles of contract law.[5] Some cases discuss the applicable principles of contract law in greater detail,[6] while other cases discuss the contract principles in lesser detail, perhaps because these principles are so well settled.[7] Even in isolation, these principles suggest significant possibility of triable issues regarding the meaning of a contract, especially an implied contract, because of the varying reasonable inferences that can be drawn from conduct and ambiguous phrasing in policy manuals.

[4]See, e.g., *Malmstrom* v. *Kaiser Aluminum & Chemical Corp.* (1986) 187 Cal.App.3d 299 [231 Cal.Rptr. 820]: " '[E]ven when the implied promise of continued employment is found, it is only a promise not to terminate the employment without " '. . . some good reason.' " ' " (*Malmstrom, supra,* 187 Cal.App.3d at p. 321, quoting from *Clutterham* v. *Coachman Industries, Inc.* (1985) 169 Cal.App.3d 1223 [215 Cal.Rptr. 795].) The proposition literally appears worded as if it were an immutable rule of law rather than a matter of potentially changeable contractual intent.

[5]The principles governing interpretation of statutes, as opposed to interpretation of contracts, illustrate the controlling nature of contract principles here. Although it is a proper function of the courts to determine the meaning of a statute, and a proper function of the courts to evaluate the constitutionality of a statute, the courts may not properly simply abrogate a statute by declaring "common law" rules contrary to a statute, since this would violate the separation of powers clause of the California Constitution. (Cal. Const. art. III, § 3; 7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 107 et seq., p. 159 et seq.)

Pertinent to the present inquiry is Labor Code section 2922, which provides that "[a]n employment, having no specified term, may be terminated at the will of either party on notice to the other." This section establishes that an employment is at will unless *the parties* have agreed otherwise. (See, e.g., *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 677 [254 Cal.Rptr. 211, 765 P.2d 373].) Although *the parties* may alter or eliminate the effect of this statute by their agreement, the Constitution, Supreme Court precedents and statutorily mandated rules of construction make clear that a court may not alter or eliminate it by judicial deletion or insertion. (Code Civ. Proc., § 1858 [office of judge is simply to ascertain and declare what is contained in statute, not to insert what has been omitted or to omit what has been inserted]; *Manufacturers Life Ins. Co.* v. *Superior Court* (1995) 10 Cal.4th 257 [41 Cal.Rptr.2d 220, 895 P.2d 56] [§ 1858 a "mandate" of statutory construction; "fundamental principle" is that statute is "to be applied according to its terms"]; *California Fed. Savings & Loan Assn.* v. *City of Los Angeles* (1995) 11 Cal.4th 342 [45 Cal.Rptr.2d 279, 902 P.2d 297] [office of judge neither to insert nor to omit]; *In re Hoddinott* (1996) 12 Cal.4th 992, 1002 [50 Cal.Rptr.2d 706, 911 P.2d 1381] [court " ' "is not authorized to insert qualifying provisions not included and may not rewrite the statute to conform to an assumed intention which does not appear from its language" ' "]; see also *Crusader Ins. Co.* v. *Scottsdale Ins. Co.* (1997) 54 Cal.App.4th 121 [62 Cal.Rptr.2d 620] [summarizing authorities].) These cases make clear that a court may not simply alter or qualify the "at will" employment statute as a matter of supposed law, and no case has been found in which a court has purported to do so. Instead, the cases are all consistent with the application of well-settled principles of contract interpretation, although not all cases repeat the applicable rules of contract interpretation in detail before applying them.

[6](See, e.g., *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654.)

[7](Cf. *Bell* v. *Superior Court* (1989) 215 Cal.App.3d 1103, 1109 [263 Cal.Rptr. 787] [Arabian, J., applying "well-established principles of contract law" in wrongful termination case].)

Below we summarize the applicable rules, since they illustrate the existence of differing reasonable inferences that could be drawn in this case.

To form a contract, a manifestation of mutual assent is necessary. (Rest.2d Contracts, § 17 (hereafter Restatement).)[8] Mutual assent may be manifested by written or spoken words, or by conduct. (Rest., *supra*, § 19.) "Contracts are often spoken of as express or implied. The distinction involves, however, no difference in legal effect, but lies merely in the mode of manifesting assent. . . . assent may be manifested by words or other conduct . . . intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance." (Rest., *supra*, § 4, com. a, p. 14; see also Civ. Code, §§ 1619 [contracts are either express or implied], and 1621 [" 'An implied contract is one, the existence and terms of which are manifested by conduct.' . . . [¶] The distinction between *express* and *implied in fact* contracts relates only to the *manifestation of assent*; both types are based on the expressed or apparent intention of the parties." (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 11, p. 46 (hereafter Witkin).) All contracts must be interpreted by the same rules. (Civ. Code, § 1635.)

"Like words, non-verbal conduct often has different meanings to different people. Indeed, the meaning of conduct not used as a conventional symbol[9] is more uncertain and more dependent on its setting than are words. A wide variety of elements of the total situation may be relevant to the interpretation of such conduct." (Rest., *supra*, § 19, com. a, p. 55.) "The meaning given to words or other conduct depends to a varying extent on the context and on the prior experience of the parties. Almost never are all the connotations of a bargain exactly identical for both parties; it is enough that there is a core of common meaning sufficient to determine their performances with reasonable certainty or to give a reasonably certain basis for an appropriate legal remedy. . . . But material differences of meaning are a standard cause of contract disputes, and the decision of such disputes necessarily requires interpretation of the language and other conduct of the parties in the light of the circumstances." (Rest., *supra*, § 20, com. b, p. 59.) Hence "[a] contract may be explained by reference to the circumstances under which it was

[8]California courts often take guidance on contract issues from the Restatement. (See, e.g., *Rosenthal* v. *Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394 [58 Cal.Rptr.2d 875, 926 P.2d 1061]; *Foley* v. *Interactive Data, supra,* 47 Cal.3d 654, 677-678 and fn. 21 [quoting from comment a to Restatement section 4 in a wrongful termination case]; *Phillipe* v. *Shapell Industries* (1987) 43 Cal.3d 1247 [241 Cal.Rptr. 22, 743 P.2d 1279]). The Restatement sets forth basic principles by proceeding from the more general to the more specific, and hence often restates in more detail a concept previously covered in general. We follow that rough progression in the text.

[9]Such as, perhaps, a nod of the head in assent.

made, and the matter to which it relates." (Civ. Code, § 1647; see also 1 Witkin, *supra*, § 688, p. 621.)

". . . the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon. In such cases courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain. [¶] An offer which appears to be indefinite may be given precision by usage of trade or by course of dealing between the parties. Terms may be supplied by factual implication, and in recurring situations the law often supplies a term in the absence of agreement to the contrary." (Rest., *supra*, § 33, com. a, p. 92.)

"Much contract law consists of rules which may be varied by agreement of the parties. Such rules are sometimes stated in terms of presumed intention, and they may be thought of as implied terms of agreement. They often rest, however, on considerations of public policy rather than on manifestation of the intention of the parties." (Rest., *supra*, § 5, com. b, p. 16.) However, "the primary search is for a common meaning of the parties, not a meaning imposed on them by the law." (Rest., *supra*, § 201, com. c, p. 84.) "A contract *must* be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting . . . ." (Civ. Code, § 1636, italics added.) "[T]he outward *manifestation* or *expression* of assent is controlling." (1 Witkin, *supra*, § 119, p. 144.) A manifestation of assent may be found even though the moment of contract formation cannot be identified. (Rest., *supra*, § 22.)

Numerous principles of interpretation guide the search for the manifested intention of the parties. (See, e.g., Rest., *supra*, § 201 et seq.) Some that can have particular pertinence to an implied contract not to terminate except for good cause context are these: "English words [such as those which appear in an employment manual] are read as having the meaning given them by general usage, if there is one. This rule is a rule of interpretation in the absence of contrary evidence, not a rule excluding contrary evidence." (Rest., *supra*, § 202, com. e, p. 89.) ". . . words and conduct are interpreted in the light of the circumstances . . . . A meaning consistent with all the circumstances is preferred to a meaning which requires that part of the context be disregarded. But the parties may have agreed to displace normal meanings . . . ." (Rest., *supra*, § 202, com. h, p. 91.) Although the various rules of interpretation apply to all manifestations of intent, "[t]hey apply only in choosing among reasonable interpretations. They do not override evidence of the meaning of the parties, but aid in determining meaning or prescribe legal effect when meaning is in doubt." (Rest., *supra*, § 203, com. a, p. 93.) "A contract must receive such an interpretation as will make it . . .

reasonable . . . if it can be done without violating the intention of the parties." (Civ. Code § 1643; see also 1 Witkin, *supra*, § 690, p. 623.) "In the absence of contrary indication, it is assumed that each term of an agreement has ·a reasonable rather than an unreasonable meaning . . . . But parties are free to make agreements which seem unreasonable to others . . . . The search is for the manifested intention of the parties. . . ." (Rest., *supra*, § 203, com. c, p. 94.)

"Stipulations which are necessary to make a contract reasonable . . . are implied, in respect to matters concerning which the contract manifests no contrary intention." (Civ. Code, § 1655; see also Rest., *supra*, § 204 ["When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."].) ■ Hence, if an employer and employee have manifested agreement to a contract not to terminate except for good cause, but the evidence does not establish any particularized agreement regarding whether the specific cause cited does or does not qualify, the court must supply a meaning which is reasonable under the circumstances. (See, e.g., *Cotran* v. *Rolling Hudig Hall Internat., Inc.*, *supra*, 17 Cal.4th 93 [no specific evidence of intended agreement otherwise, reasonable meaning supplied]; cf. *Moore* v. *May Dept. Stores Co.*, *supra*, 222 Cal.App.3d 836 [finding and applying agreed meaning for good cause].)

"The supplying of an omitted term is not technically interpretation, but the two are closely related; courts often speak of an 'implied' term. . . . [¶] . . . The parties to an agreement may entirely fail to foresee the situation which later arises and gives rise to a dispute; they then have no expectations with respect to that situation, and a search for their meaning with respect to it is fruitless. Or they may have expectations but fail to manifest them, either because the expectation rests on an assumption which is unconscious or only partly conscious, or because the situation seems unimportant or unlikely, or because discussion of it might be unpleasant or might produce delay or impasse. [¶] . . . [¶] . . . Sometimes it is said that the search [for an omitted term or omitted meaning] is for the term the parties would have agreed to if the question had been brought to their attention. Both the meaning of the words used and the probability that a particular term would have been used if the question had been raised may be factors in determining what term is reasonable in the circumstances. But where there is in fact no agreement, the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process." (Rest., *supra*, § 204, coms. a, b and d, pp. 97-98.)

"A contract is to be interpreted according to the law and usage of the place where it is to be performed . . . ." (Civ. Code, § 1646; see also Rest., *supra*, § 220.) "Usage is a habitual or customary practice." (Rest., *supra*, § 219; see also 1 Witkin, *supra*, § 696, p. 629.) "Stipulations which are necessary to make a contract . . . conformable to usage, are implied, in respect to matters concerning which the contract manifests no contrary intention." (Civ. Code § 1655.) ■ "An agreement or term thereof need not be stated in words if the parties manifest assent to it by other conduct, and such assent is often manifested by conduct in accordance with usage. . . . Whether a usage is reasonable may bear on the issue whether the parties contracted with reference to it, but if they did they are not in general forbidden to make agreements which seem unreasonable to others." (Rest., *supra*, § 220, com. c, p. 148.) "Language and conduct are in general given meaning by usage rather than by the law, and ambiguity and contradiction likewise depend upon usage." (Rest., *supra*, § 220, com. d, p. 149.) ". . . if there is a reasonable usage which supplies an omitted term and the parties know or have reason to know of the usage, it is a surer guide than the court's own judgment of what is reasonable." (Rest., *supra*, § 221, com. a, p. 151.) "The more general and well-established a usage is, the stronger is the inference that a party knew of or had reason to know of it. Similarly, the fact that a usage is reasonable may tend to show that the parties contracted with reference to it or that a particular party knew or had reason to know of it. Where the parties in fact agree to a usage, there is no general requirement that their usage seem reasonable to others; but where there is no agreement only a reasonable usage supplies an omitted term. What is reasonable for this purpose depends on the circumstances . . . ." (Rest., *supra*, § 221, com. b, p. 152.)

General usages of trade and course of dealing may also supplement or explain an agreement. (Rest., *supra*, §§ 222, 223; see also Civ. Code, § 1655; *Varni Bros. Corp.* v. *Wine World, Inc.* (1995) 35 Cal.App.4th 880 [41 Cal.Rptr.2d 740] [custom and usage supplying term of implied contract].)

IV. *The law applied to plaintiff's wrongful termination claim.*

Aetna stated that it assumed, for purposes of its summary judgment motion, that the parties had impliedly concluded a contract that plaintiff would not be terminated except for good cause.[10] Aetna's primary thrust was then to demonstrate that its reason for terminating plaintiff did amount to good cause. Aetna's motion contended that "[t]here can be no question that Aetna had good cause to terminate Plaintiff's employment," based solely on

_____

[10]If it should be determined that no such implied contract existed, then Aetna will of course be entitled to prevail on this claim notwithstanding any part of the discussion here.

the Rancho Bernardo "invoice" incident. Aetna's beginning assumption did not include, however, any assumption about any particular content or meaning for "good cause" to which these particular parties had impliedly agreed. A motion which begins on such an assumption is based on an unstable footing. As noted in the review of contract law above, different parties can agree to a different content for contractual terms in different situations. Only when there is insufficient evidence of a meaning placed on the term by the parties can the court supply a reasonable meaning pursuant to contract law. This principle is so bedrock that it has been solidified in statute. (Civ. Code, § 1655; see also discussion above.)

The parties here, despite Aetna's initial assumption that a contract not to terminate except for "good cause" existed, wisely did not rely wholly on abstract case law to supply a meaning for "good cause." Instead, they presented evidence of Aetna's Code of Conduct, Aetna's employee handbook, plaintiff's longevity and unblemished service record, Aetna's handling of other employee disciplinary issues, etc., to suggest content for the "good cause" term impliedly agreed to by these parties. Implied contracts not to terminate except for good cause normally develop by accretion over extended periods. This is reflected in the types of conduct approved by case law as evidence of an implied agreement: longevity of service, promotions, awards, lack of criticism over time, and the like. It often may be the case that an employer and employee have not, gradually over an extended period, manifested assent to any specialized meaning of "good cause" different from the general standards supplied by case law in the absence of manifestation of "contrary intention." (Civ. Code, § 1635.) Hence application of a "default" reasonable standard set by case law may be a proper application of contract law in most instances. Here we must consider, however, the evidence of meaning supplied by the parties and the inferences that might be drawn from that evidence. Moreover, since we review here a summary judgment, we must construe plaintiff's evidence liberally and accept all reasonable inferences which could be drawn by a trier of fact in favor of plaintiff.

Plaintiff relies heavily on *Cotran* v. *Rollins Hudig Hall Internat., Inc.*, *supra*, 17 Cal.4th 93. *Cotran* primarily considered the proper role of a jury in a wrongful termination case. *Cotran* decided that the jury's role did not extend to deciding whether the acts for which the employee was terminated actually occurred, but was instead limited to determining whether the employer had made a reasonable investigation and reasonably believed that the acts justifying termination had occurred. In the instant case, the acts for which plaintiff was terminated (the Rancho Bernardo Inn "invoice" incident) are undisputed. Hence the primary thrust of *Cotran* is not involved in this case. *Cotran*, however, also discussed the meaning of "good cause."

■ What constitutes good cause in a particular setting can be a function of the parties' mutual agreement. (Civ. Code, §§ 1635, 1636, 1655.) Since an agreement between the parties in this context is only implied from the surrounding circumstances and conduct, it follows that what constitutes good cause in a particular setting is similarly only implied from the surrounding circumstances and conduct. In order to determine what the parties have implicitly agreed will constitute good cause, it is therefore generally necessary to examine the circumstances in which the implied agreement arose, and the conduct which gave rise to that implied agreement. (See, e.g., *Walker* v. *Blue Cross of California* (1992) 4 Cal.App.4th 985 [6 Cal.Rptr.2d 184], ["good cause" is relative; whether good cause exists depends upon the particular circumstances of each case], cited with approval in *Cotran* v. *Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at p. 100.) Both sides in this case have recognized this proposition by presenting evidence of the circumstances involved here.

■ The Supreme Court elaborated in *Cotran* that "good or just cause . . . is *not*: reasons that are ' "trivial, capricious, unrelated to business needs or goals, or pretextual." ' " (*Cotran* v. *Rollins Hudig Internat., Inc., supra,* 17 Cal.4th at p. 96.) In further defining "good cause," the Supreme Court in *Cotran* drew heavily from *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311 [171 Cal.Rptr. 917]: The Court of Appeal opinion in *Pugh, supra,* 116 Cal.App.3d 311, recognized that "[t]he terms 'just cause,' and 'good cause', . . . [Citation.] . . . connote 'a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power.' " (*Id.* at p. 330, quoting *R. J. Cardinal Co.* v. *Ritchie* (1963) 218 Cal.App.2d 124, 144, 145 [32 Cal.Rptr. 545].)

"In *Walker* v. *Blue Cross of California* (1992) 4 Cal.App.4th 985 [6 Cal.Rptr.2d 184], the court described 'good cause' as 'relative. Whether good cause exists is dependent upon the particular circumstances of each case. [Citation.] [¶] In deciding whether good cause exists, there must be a balance between the employer's interest in operating its business efficiently and profitably and the employee's interest in continued employment. . . .' . . . [¶] In its posttrial opinion in the *Pugh* litigation—*Pugh* v. *See's Candies, Inc.* (1988) 203 Cal.App.3d 743 [250 Cal.Rptr. 195] (*Pugh II*)— the Court of Appeal elaborated on the jurisprudential significance of employer discretion: '[A]n employer must have wide latitude in making independent, good faith judgments about high-ranking employees without the threat of a jury second-guessing its business judgment. Measuring the effective performance of such an employee involves the consideration of many intangible attributes such as personality, initiative, ability to function as part of the management team and to motivate subordinates, and the ability to

conceptualize and effectuate management style and goals. . . . [Citations.] *Although the jury must assess the legitimacy of the employer's decision to discharge, it should not be thrust into a managerial role.*' (*Id.* at p. 769, italics added.)" (*Cotran v. Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at pp. 100-101.)

The opinion in *Cotran* describes no evidence which suggested any particular meaning for the "good cause" concept in the parties' implied agreement. Instead, *Cotran* quoted with approval from an Oregon case which dealt with the same point in issue in *Cotran* in the context of "absence of any evidence of express or implied agreement."[11] In identifying the reasonable term to be supplied by contract law in these circumstances (cf. Civ. Code § 1655), *Cotran* emphasized the need for latitude for managerial discretion, as noted above. In ultimate summary, the Supreme Court stated in *Cotran*: "We give operative meaning to the term 'good cause' in the context of implied employment contracts by defining it, under the combined *Scott-Pugh* standard (*ante,* at p. 96), as fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual." (*Cotran v. Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at pp. 107-108.)

Our question, therefore, is whether the evidence in this summary judgment case eliminates all possibility of reasonable inference that, in this case, Aetna did not act for "fair and honest reasons, regulated by good faith," and in accordance with the parties' manifested intentions. Put in the reciprocal, the question is whether the evidence presents the possibility that the Rancho Bernardo "invoice" incident as a reason for termination was, viewed in light of all the circumstances as recited above, "trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual," and in breach of the parties' implied agreement. A jury could well draw inferences in favor of Aetna on these questions, and perhaps is most likely to do so. However, a reasonable jury could also draw inferences in favor of plaintiff on these questions. (See, e.g., *Walker v. Blue Cross of California, supra,* 4 Cal.App.4th 985 ["good cause" is relative; whether good cause exists depends upon the particular circumstances of each case]; cited with approval in *Cotran v. Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at p. 100.)

---

[11](See *Cotran v. Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at p. 103, quoting from *Simpson v. Western Graphics Corp.* (1982) 293 Or. 96 [643 P.2d 1276, 1279] ["Analyzing the contractual origin of the employment relationship, the *Simpson* opinion concluded there was no basis to infer that 'the employer *intended to surrender its power to determine whether facts constituting good cause for termination exist.* . . . *In the absence of any evidence of express or implied agreement whereby the employer contracted away its fact-finding prerogative* . . . , *we shall not infer it.*' "], italics added by Supreme Court in *Cotran.*)

Aetna presented evidence of Aetna's internal operating policies and manuals, which had been provided to plaintiff. These generally prohibit "dishonest" conduct. Aetna offered this evidence to show that the Rancho Bernardo "invoice" incident was within the meaning of "good cause" applicable to this implied agreement. This evidence had considerable persuasive force in the sense that it could well sway a finder of fact. However, the terms of Aetna's general policies were not specific enough to conclusively establish, in the unique and apparently unanticipated circumstances presented, that the parties implicitly agreed that an incident such as the Rancho Bernardo "invoice" incident would constitute good cause for termination notwithstanding all other considerations. Plaintiff presented evidence that he was a long term employee with an unblemished history of good performance. At age 55, after 30 years of service, and in possession of a severance offer worth $170,000 and an alternative offer of continued employment potentially worth even more, he obviously had a strong interest in maintaining his employment. The Rancho Bernardo "invoice" incident was an isolated event. Aetna did not present a "cumulative" case in support of termination, showing an aggregation of improper conduct eventually amounting to indisputable good cause. The "circumstances" referenced in Aetna's manuals which would result in a warning rather than termination were not so clearly defined as to conclusively establish an implied agreement that termination would be warranted by these specific circumstances. Although all of plaintiff's business expense reimbursement requests were reviewed after the Rancho Bernardo "invoice" incident, no irregularities were found. Aetna had no evidence that plaintiff presented any significant danger of dishonest conduct, or that plaintiff was in any way unfit to perform his duties. To the contrary, Aetna agreed that plaintiff was performing his duties satisfactorily. The money involved in the Rancho Bernardo "invoice" incident was earned compensation. Plaintiff had claimed nothing from Aetna to which he was not entitled. Plaintiff had been assigned to a new supervisor shortly before the Rancho Bernardo "invoice" incident, and had experienced conflicts with his supervisor over plaintiff's disagreement with his supervisor's managerial actions. Plaintiff's supervisor stated that he considered plaintiff to be "difficult" to work with, allegedly as a consequence of these differences of opinion, notwithstanding that this had nothing to do with the Rancho Bernardo "invoice" incident. There therefore was evidence that plaintiff's supervisor wanted to terminate him for reasons independent of the Rancho Bernardo "invoice" incident. The evidence suggested that Aetna had handled other incidents quite differently, even though they were at least arguably comparable in important respects.

Putting aside the claims of age discrimination, which are dealt with in the unpublished portion of this opinion, the evidence could reasonably support an inference that a termination for the Rancho Bernardo "invoice" incident

was "trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual," that Aetna had not acted for "a fair and honest cause or reason, regulated by good faith," and that a termination for the reason cited did not amount to good cause within the meaning of the parties' contract. Instead, an inference could be drawn that Aetna merely seized upon the Rancho Bernardo "invoice" incident as a justification for terminating plaintiff, which Aetna wanted to do for other reasons, even though the parties' implied agreement would not classify this incident as serious enough to warrant termination in the face of other mitigating factors. In view of the possibility of such an inference, summary judgment should have been denied, even though this record suggests a significant possibility of a meritorious defense, and bearing in mind the trial court's duty to ensure that a jury does not simply usurp the managerial role.[12]

[12]Plaintiff also argues that even if the Rancho Bernardo "invoice" incident did constitute good cause to terminate, summary judgment should nevertheless have been denied. He argues that even if the incident constituted good cause, Aetna might subjectively and secretly have harbored some other motivation for his termination, a motivation that—standing alone—did not constitute good cause. He argues that the Rancho Bernardo "invoice" incident, even if accepted as good cause, might have been a pretext for allowing Aetna to terminate him for some secret non-good-cause reason. Hence he argues that a jury should be allowed to determine whether Aetna actually terminated him for a hidden non-good-cause reason, even if Aetna did have good cause to terminate.

Plaintiff draws this argument largely from the definition and treatment of the "good cause" concept in case law. (See, e.g., *Pugh* v. *See's Candies, Inc., supra,* 116 Cal.App. 311, 329 (*Pugh I*) ["Appellant may attack the employer's offered explanation . . . on the ground that it is pretextual . . . and that the real reason is one prohibited by contract . . . ."]; *Cotran* v. *Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th 93, 96 [good or just cause is *not* "reasons that are ' "trivial, capricious, unrelated to business needs or goals, or pretextual" ' ].) Plaintiff's argument seizes on the "pretextual" terminology, and summarizes it as this: even if an employer had indisputable good cause to terminate, a jury nevertheless must decide whether the good cause reason was the "real" reason. The jury may decide that the good cause reason was not the "real" motivation for the termination. If the good cause reason was not the "real" reason for the termination, then the good cause reason was pretextual, and the employer is liable even though it did have good cause to terminate.

This argument finds support in the semantics of the case law defining and expounding upon the "good cause" concept as noted above. However, this argument also has problematic implications if accepted. The cases uniformly emphasize that care must be taken not to interfere with the legitimate exercise of managerial discretion. (See, e.g., *Cotran,* v. *Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at p. 101 [" *Although the jury must assess the legitimacy of the employer's decision to discharge, it should not be thrust into a managerial role.' "]; Pugh I, supra,* 116 Cal.App.3d at p. 330.) Plaintiff's argument appears to conflict with these directives by requiring jury redetermination of most, if not virtually all, reasons for termination, no matter how clearly good cause might exist.

For example, a hypothetical terminated employee who punched a coworker, causing her significant facial injuries, could nevertheless go to the jury on his evidence of friction with his supervisor and his theory that the supervisor simply wanted to eliminate possible eventual competition from a highly competent subordinate. Being highly competent, would go the argument, is not good cause for termination. Hence if that was the "real" reason for the termination, rather than punching the coworker, the jury could find the employer liable even

V., VI.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

VII. *Disposition.*

The summary judgment is reversed. Plaintiff (appellant) to recover costs.

Nott, Acting P. J., and Mallano, J.,† concurred.

Respondents' petition for review by the Supreme Court was denied February 16, 2000.

---

though the employee did punch the coworker. On this type of reasoning (many other hypotheticals could be constructed), many if not most terminations could be driven to trial by resourceful counsel, regardless of the indisputable existence of good cause. (Cf., e.g., BAJI No. 2.01 ["The testimony of one witness worthy of belief is sufficient to prove any fact."].)

Yet the Supreme Court stated in a related context in *Cotran* that ". . . a standard permitting juries to reexamine the factual basis for the decision to terminate for misconduct—typically gathered under the exigencies of the workaday world and without benefit of the slow-moving machinery of a contested trial—dampens an employer's willingness to act, intruding on the 'wide latitude' the court in *Pugh II* [, *supra*, 203 Cal.App.3d 743] recognized as a reasonable condition for the efficient conduct of business." (*Cotran* v. *Rollins Hudig Hall Internat., Inc.*, *supra* 17 Cal.4th at pp. 105-106.) Hence it seems unlikely that the term argued for by plaintiff would be supplied by a court as a "reasonable" implied term of a contract. (Cf. Civ. Code, § 1654.)

We do not answer here the question of whether an employee may recover for a termination, notwithstanding the indisputable existence of good cause to terminate, on the theory that the indisputable good cause was a "pretext" for a non-good-cause reason. This case presents the preliminary question of whether the cause for termination cited by the employer (the Rancho Bernardo "invoice" incident) was or was not good cause within the meaning of the parties' implied contract. If it was not, the employee will prevail. If it was, the issue of whether the employee can nevertheless prevail on the "pretext" theory can be more fully developed.

*See footnote, *ante*, page 832.

†Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.