Filed 2/15/22  Ndiaye v. Air Canada CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| KARIM NDIAYE, | B305970 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC712764) |
| v. | |
| AIR CANADA, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County,  Holly J. Fujie, Judge.  Reversed.

Benedon & Serlin, Douglas G. Benedon and Melinda W. Ebelhar for Plaintiff and Appellant.

Littler Mendelson and Robert S. Blumberg for Defendant and Respondent.

_____

Karim Ndiaye filed suit against respondent Air Canada, his former employer, asserting various employment discrimination related causes of action arising out of his termination. The trial court granted summary judgment in favor of respondent, finding Ndiaye failed to raise a triable issue as to whether respondent's articulated reason for the adverse employment action—that Ndiaye failed to submit the necessary paperwork to support his medical disability leave—was pretext for unlawful discrimination and retaliation. We conclude otherwise and reverse the trial court's judgment on the causes of action raised and preserved by Ndiaye in this appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual History*[1]

Ndiaye began working for Air Canada in 2002 as a customer service representative at Los Angeles International Airport (LAX). At Air Canada, customer service representatives report to a Lead, and then to a JO6 supervisor. These employees are, in turn, supervised by the customer service manager and the Station Manager.

In 2006, Alioune Sow was hired by Air Canada as the customer service manager at LAX, and, in 2008, was promoted to the position of Station Manager. In these positions, Sow both directly and indirectly supervised Ndiyae.

---

[1] The following facts were set forth in the motion for summary judgment, opposition, and supporting evidence. To the extent the court granted the parties' evidentiary objections, that evidence has been omitted.

1. *Ndiaye's History with Supervisor Alioune Sow*

    a. *Statements by Sow regarding Wolof Senegalese*

Ndiyae and Sow are both from Senegal. Ndiaye is an ethnic Wolof and Sow is an ethnic Fulani. Fulani Senegalese and Wolof Senegalese have a long history of conflict based on their ethnic and religious differences.

In 2010, Ndiaye was in Sow's office in Ndiaye's capacity as a shop steward representing another employee. After this meeting concluded and the other employee left the office, Sow stated that all the problems in Senegal were because a Wolof was president. He told Ndiaye that as long as a Wolof was president the situation there would never improve. Ndiaye was deeply offended by this comment.

In 2013, Sow and his family took a trip to Senegal. When he returned, he told Ndiaye that when he got to the airport in Senegal he was furious because he was surrounded by Wolof cab drivers trying to get him to hire them. He stated that after they got a cab, other Wolofs surrounded the cab and tried to sell the family goods. ~ (CT 1631)~ Sow was visibly upset when he recounted this to Ndiaye, and stated that if he were president of Senegal he would have all the Wolof people executed. Ndiaye asked Sow if he was serious and he replied, "yes I am."

Ndiaye was upset by Sow's comments, and feared he would be terminated because of his Wolof ethnicity.

### b.  *Sow's Discipline of Ndiaye*

In 2009, Sow gave Ndiyae a ten-day suspension for being late twice to work and sick four times over a year and a half.  Included in this write-up was a reprimand for not providing a doctor's note for the days Ndiaye was sick, even though he was never out for more than a day at a time, and Air Canada does not require a doctor's note unless an employee misses more than three days of work.

On other occasions when Ndiaye was out from work pursuant to a doctors' orders, Sow would still include this as an absence for the purposes of giving Ndiaye suspensions and write ups.  In 2012, Sow wrote up Ndiaye for "insubordination," based on (according to Ndiaye) false facts.

Other times, Sow would demean Ndiyae in front of other employees by giving him the "silent treatment" at work.  These periods of silence lasted days and sometimes even months and occurred approximately ten times during Ndiaye's employment.  After Sow's harassment began to affect his health and daily activities, Ndiaye sought treatment.  However, when he told Sow about the stress, Sow simply made it a habit to write him up and give him suspensions for times when he was out on sick leave.

### c.  *Ndiaye's Complaints about Sow's Behavior*

In January 2015, Ndiaye told Chat Satter, his union representative, that Sow was treating him differently based on their different religions and ethnicity.  Ndiaye also complained to his direct supervisor, Youssef Salib about Sow's treatment.  After that, Ndiaye

4

began to experience more severe stress while he was at work and was constantly afraid of Sow and being fired without cause.

2. *Ndiaye Takes Medical Leave on February 3, 2015*

In February 2015, Sow was once again giving Ndiaye the "silent treatment." He broke that silence on the morning of February 3 to tell Ndiaye to sign a new version of Air Canada's code of conduct. This was not how previous Codes had been distributed and Ndiaye had not had a chance to review it. Sow began yelling at Ndiaye that he, Sow, was the boss and that Ndiaye had to sign the document immediately. As this was the first time Sow had spoken to him in months, Ndiaye was upset and thought Sow was once again looking for a way to get him fired.

Even though Ndiaye was shaken and upset, he returned to work and resumed his duties at the gate, controlling a flight leaving for Montreal. After the flight left, however, Ndiaye was not doing well and explained to his union shop stewards that he needed to leave work. A shop steward accompanied Ndiaye to speak with Youssef Salib. Ndiaye told Salib he was being harassed by Sow and needed to go home due to anxiety. Ndiaye told Salib he would bring a doctor's note excusing his absence.

Ndiaye subsequently obtained a doctor's note excusing him from work from February 6—his next scheduled workday—to March 6. Ndiaye personally delivered the note to his JO6 for Salib. On February 12, 2015, Salib sent an email to the benefits department, noting that Ndiaye was "still out on medical leave" and currently scheduled "to return to work on March 6, 2015." The email requested that Ndiaye's

5

"employee profile" be "update[d] . . . accordingly." Sow was copied on the email.[2]

After starting his disability leave, Ndiaye filed a claim with state disability. When the state sent Ndiaye his first check, he sent a copy of that check to Air Canada pursuant to Air Canada's policy. After Air Canada received this check, Ndiaye's pay from Air Canada was reduced by 30 percent, the amount Ndiaye was receiving from the state.[3]

In early March, Ndiaye provided his JO6 with another doctor's note excusing him from work from March 6 to April 6. Around the end of March, Ndiaye spoke with Susan Shum, an Air Canada administrative assistant responsible for receiving doctor's notes from employees.[4] Ndiaye explained to Shum that he was still out on disability leave and was not sure when he would return. Shum did not ask Ndiaye to provide any additional paperwork.

Other than this conversation with Shum, no one from Air Canada contacted Ndiaye during the months of March, April, or May to discuss

---

[2] Plaintiff's counsel included a copy of this email, along with others, as part of Exhibit H. Although respondent successfully objected to other emails in this exhibit (involving some sample letters sent to Sow by HR months later) it did not challenge this email. Respondent also did not object to Sow's deposition testimony during which the email was read aloud to him and he admitted he viewed it.

[3] Respondent acknowledges that Ndiaye was provided with a leave of absence starting on February 3, 2015 and paid in accordance with the disability provisions of his collective bargaining agreement (CBA).

[4] When Ndiaye took his leave on February 3, the position of administrative assistant was vacant; Shum was hired sometime in March 2015.

his illness or the reasons for his disability leave, or to request that he submit any additional paperwork.[5]

In June, Ndiaye was still being treated for stress and anxiety. On June 8, 2015, he provided Air Canada with a doctor's note prolonging his disability leave for another seven weeks, until July 31. Shum subsequently notified Sow that Aetna had not received any documentation from Ndiaye, nor approved his leave. Sow contacted Air Canada's Human Resources Department, and was told that there was no documentation in Ndiaye's employee file indicating approval from Aetna. Sow was told to send a letter to Ndiaye asking him to provide documentation to support his leave.

3. *On June 26, 2015, Sow Sends Ndiaye a Letter, Stating he Has Been on Unapproved Leave and Threatening to Terminate Him if he Fails to Submit Documentation to Aetna*

On June 30, Ndiaye received a letter from Sow, dated June 26, stating that Ndiaye had been on an "unapproved" absence since February 3.

Sow told Ndiaye that, in accordance with article 16 of the collective bargaining agreement (CBA), he was required "to provide Aetna with completed documentation in support of [his] existing condition that prevent[ed] [him] from otherwise reporting to work."

---

[5]    As discussed, *post*, section 5, Air Canada claims its benefits department sent Ndiaye a letter and medical form on February 26, 2015, requesting he submit the medical form to Aetna. According to Ndiaye, he never received this letter, and the record indicates that issue was disputed, with evidentiary objections granted on the point.

Sow concluded that, if Ndiaye did not return the documentation by July 6, which was only three working days from his receipt of the letter, he would be suspended without pay "followed by a permanent termination from the company for desertion." The letter did not explain what documentation was required, nor include any forms or other paperwork.[6] Nor did the letter state that any prior letters or documents had been sent to Ndiaye by Air Canada. (See section 5, *post.*)

Ndiaye made calls to Air Canada, Aetna, and his union representatives. During a July 2, 2015 telephone conversation with Aetna (documented by Aetna), a representative informed Ndiaye that no claim had been opened on his behalf and stated that it is typically the employer who would be sending in the paperwork. The representative offered to transfer Ndiaye to intake, to "start the claim over the phone." Ndiaye responded that he did not know, and would speak to his company. Ndiaye thereafter spoke to his union representative, and Air Canada administrative assistant, Susan Shum. During his phone call with Shum, Ndiaye confirmed that he was not out on an unapproved absence and that he would be returning on July 31st.

---

[6] Article 16.03.02 of the CBA, the provision relied on by Air Canada, provides that "[d]etermination of eligibility [for medical disability status] by Air Canada Medical Services will be made after suitable application by the employee for continuance of the status, which shall include a statement, narrative summary or other report from the employee's physician indicating the medical diagnosis, symptoms and prognosis of the disabling condition."

4.      *On July 9, 2015, Air Canada Terminates Ndiaye's Employment, for Taking Unauthorized Leave and Abandoning his Position*

By letter dated July 9—three days after expiration of the deadline for Ndiaye to return the completed paperwork to Aetna—Air Canada terminated him for "abandon[ing] [his] employment" due to an unapproved absence since February 3, 2015.  The letter stated Air Canada had "not been successful in obtaining information, documentation, or confirmation from yourself or your manager [Sow] to support or substantiate your absence from work."  The letter further stated that Ndiaye's manager (Sow) "has confirmed several attempts to contact you have not resulted in your required response."

The letter was signed by Air Canada's Employee Services manager, Steve Pawluk, and sent out of Tampa, Florida.  When Ndiaye contacted Steve Pawluk, Pawluk told Ndiaye he had been terminated because Sow had told him Ndiaye had left work on February 3 and had not returned or otherwise communicated with anyone at Air Canada.  Ndiaye explained this was not true and that he had sent in doctor's notes and been in communication with Air Canada during the time he was out on leave.[7]

---

[7]      Although respondent in its brief broadly accuses Ndiaye of relying on "inadmissible hearsay evidence and speculation" respondent fails to identify any facts cited by Ndiaye that were excluded by the trial court.

We note here that respondent interposed no objection to Ndiaye's declaration and deposition testimony referencing the above statements made by Pawluk.  (Cf. *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 452, fn. 3 [noting that "[d]efendant's failure to object to the deposition testimony bars any hearsay objection on appeal"].)

At the time Ndiaye was terminated, he had been employed by Air Canada for over 13 years. As of the effective date of his termination— July 9, 2015—Ndiaye still had 26 days of disability leave available under the CBA.[8]

5. *The Disputed February 26, 2015 Letter*

In support of its summary judgment motion, Air Canada asserted it had sent Ndiaye a letter on February 26, with a medical form, instructing Ndiaye to send documentation to Aetna supporting his disability leave. The copy of the letter submitted as an exhibit by Air Canada is unsigned and does not include any medical form. According to Ndiaye, he never received this letter and the record reflects some confusion at Air Canada caused by a change in procedure.[9]

That is, when Ndiaye had taken disability leave in 2007 and 2009, he was sent the paperwork by a third-party provider, IBM, to be completed by his doctor and returned to IBM. Ndiaye complied with these procedures. In 2014, shortly before Ndiaye took his current leave, Air Canada changed this process and started processing employee requests for benefits "in house" through its own benefits team.

---

Pawluk passed away in 2017.

[8] The CBA provides for 182 days of paid disability leave. Ndiaye was out on leave from February 3, 2015.

[9] Ndiaye also declared that a copy of the letter was not in his personnel file, which he received after his termination.

After Ndiaye informed his supervisor, Salib, of his disability leave in the instant case, on February 12, 2015, Salib sent an email to Sow and Air Canada's benefits department reporting Ndiaye's leave. On February 25, 2015, Yasmine Francois sent an email to Andre at the benefits department to inquire whether he had sent a short-term disability (STD) package to Ndiaye. Andre replied that he had not, and was trying to figure out to whom he needed to send packages.

No one from Air Canada followed up with Ndiaye or Andre to confirm the STD package had been sent and received until four months later. On June 18, Francois sent a follow-up email to Andre to confirm he had sent the package. Andre said he had sent out the package, then asked "did he [receive] it?" No one from Air Canada communicated with Ndiaye to confirm he had received any STD package.

The trial court sustained Ndiaye's objection to the February 26, 2015, letter, submitted as an exhibit with Francois's declaration. Ndiaye objected on the grounds that there was no personal knowledge that it was actually sent nor sufficient authentication of the document.[10]

B. *Procedural History*

After obtaining a right to sue notice from the DFEH. Ndiaye brought this action against Air Canada alleging causes of action for (1)

---

[10] The same letter was submitted as an exhibit with the declaration of senior Global Benefits manager Inas Assaad, without separate objection. However, Assaad merely stated that the exhibit was a true copy of a "standard leave of absence letter" "[c]ontained in Plaintiff's file."

discrimination in violation of the Fair Employment and Housing Act, Government Code section 12940 et seq. (FEHA);[11] (2) harassment in violation of FEHA; (3) discrimination in violation of the California Family Rights Act (CFRA) (§ 12945.2); (4) failure to provide a reasonable accommodation in violation of FEHA; (5) failure to engage in a good faith interactive process in violation of FEHA; (6) failure to prevent discrimination, harassment, and retaliation in violation of FEHA; (7) retaliation in violation of FEHA; (8) wrongful termination in violation of public policy; and (9) intentional infliction of emotional distress.[12]

Respondent moved for summary judgment and summary adjudication, arguing, in part, that Ndiaye was terminated because of his failure to submit documentation to Aetna in support of his leave request, as opposed to any discriminatory or retaliatory reason. Ndiaye filed a timely notice of appeal.

## DISCUSSION

Ndiaye contends that the trial court erred in granting summary judgment in favor of Air Canada on his: discrimination claim (first cause of action); retaliation claims (third and seventh causes of action); failure to prevent discrimination and retaliation claim (sixth cause of action) and failure to provide reasonable accommodation/engage in the

---

[11]     All further references are to the Government Code unless otherwise indicated.

[12]     Sow was subsequently dismissed as a defendant.

12

interactive process claims (fourth and fifth causes of action). We agree and therefore reverse.

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).) "Declarations of the moving party are strictly construed, those of the opposing party are liberally construed, and doubts as to whether a summary judgment should be granted must be resolved in favor of the opposing party." (*Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 754 (*Johnson*).)

The moving party bears "the burden of demonstrating as a matter of law, with respect to each of the plaintiff's causes of action, that one or more elements of the cause of action cannot be established, or that there is a complete defense to the cause of action. [Citations.] If a defendant's presentation in its moving papers will support a finding in its favor on one or more elements of the cause of action or on a defense, the burden shifts to the plaintiff to present evidence showing that contrary to the defendant's presentation, a triable issue of material fact actually exists as to those elements or the defense." (*Johnson, supra,* 173 Cal.App.4th at p. 753.)

In ruling on a motion for summary judgment, "[t]he trial court may not weigh the evidence in the manner of a factfinder to determine whose version is more likely true. [Citation.] Nor may the trial court grant summary judgment based on the court's evaluation of credibility."

13

(*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 840; accord, *McCabe v. American Honda Motor* Co. (2002) 100 Cal.App.4th 1111, 1119.)

I.     *Summary Adjudication of the FEHA Discrimination Claim was Error*

California's FEHA makes it an unlawful employment practice to discharge or discriminate against employees in the "terms, conditions, or privileges of employment" because of a physical or mental disability or medical condition, religion, and ethnicity.  (§ 12940, subd. (a); *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 960, 991 (*Nadaf-Rahrov*).)  Courts analyze discrimination claims under a three-step framework.  "First, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  The employer then must offer a legitimate nondiscriminatory reason for the adverse employment decision.  Finally, the plaintiff bears the burden of proving the employer's proffered reason was pretextual."  (*Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 236 (*Brundage*); see also *Guz, supra,* 24 Cal.4th at p. 355.)

In the context of disability discrimination, a plaintiff can establish a prima facie case by proving that: (1) plaintiff suffers from a disability; (2) plaintiff is a qualified individual; and (3) plaintiff was subjected to an adverse employment action because of the disability.  (*Brundage, supra,* 57 Cal.App.4th at p. 236.)  In the context of discrimination, generally, a plaintiff can establish a prima facie case by proving that (1)

14

he is a member of a protected class; (2) he suffered an adverse employment action; and (3) similarly situated persons who were not members of the protected class did not suffer the same adverse employment action. (*Nadaf-Rahrov, supra,* 166 Cal.App.4th at p. 991.)

For purposes of this appeal, respondent does not argue that Ndiaye failed to establish a prima face case of discrimination or that he was subjected to the adverse action of termination.[13] Instead, respondent contends that Ndiaye has failed to demonstrate either that its proffered reason was pretextual, or that Air Canada acted with discriminatory animus in terminating him. Accordingly, we focus our discussion on step three of the relevant analysis. However, we first address the trial court's determination that Ndiaye failed to show Sow was responsible for his termination.

---

[13] While respondent addresses the issue of pretext in relation to Ndiaye's ethnic and disability-related discrimination claims pled under his first cause of action, respondent asserts that Ndiaye has abandoned any claims based on age or religious discrimination by failing to present facts or argument on these issues.

We agree with respondent with regard to Ndiaye's age discrimination claim. In his opposition papers below, Ndiaye expressly stated he was not pursuing his age discrimination claim and Ndiaye has not claimed otherwise in this appeal.

We disagree, however, with the assertion that Ndiaye has abandoned his claim of religious discrimination. Ndiaye presented evidence that the Wolof and Fulani, who share a history of conflict, are "distinct ethnic and religious groups" with their own religious affiliations and cultures. Accordingly, we allow the religious-based discrimination claim to stand.

A.      *Ndiaye Presented Sufficient Evidence from Which a Jury Could Conclude that Sow Caused Ndiaye's Termination*

The trial court concluded that Ndiaye failed to present evidence that (1) Sow was responsible for his termination, or had the authority to affect or impact his termination, or that (2) Pawluk acted out of discriminatory animus in terminating Ndiaye.  As explained below, if Pawluk relied on facts supplied by Sow in making his decision, Pawluk's own lack of discriminatory animus is not dispositive of Ndiaye's claims.

That is, under the imputed motivation doctrine, an employer may be liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision.  (See generally *DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551  ["[S]howing that a significant participant in an employment decision exhibited discriminatory [motive] is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such [motive]"]; see also *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 113 (*Reeves*) ["To establish an entitlement to judgment as a matter of law, it is not enough to show that one actor acted for lawful reasons when that actor may be found to have operated as a mere instrumentality or conduit for others who acted out of discriminatory or retaliatory animus, and whose actions were a but-for

16

cause of the challenged employment action"].)[14]  If the plaintiff shows that the decision maker acted in accordance with the discriminator's decision without independently evaluating the employee's situation, causation is established. (*Id.* at p. 116 [finding triable issue of fact on question whether manager acted as the tool for supervisor's retaliatory motive and put that motive into effect].)

Here, Ndiaye presented substantial evidence from which a jury could conclude that it was Sow who caused his termination.

First, Pawluk expressly told Ndiaye he had been terminated because Sow reported to Pawluk that Ndiaye had left work on February 3 and had not returned or otherwise communicated with anyone at Air Canada.  Pawluk was not aware that Ndiaye had submitted physician's notes throughout his leave, or had spoken with anyone at Air Canada during his absence.  Pawluk's statements to Ndiaye are consistent with the termination letter Pawluk drafted and sent on July 9, 2015, stating, "*[y]our manager has confirmed* several attempts to contact you have not resulted in  your required response" and that the company had been

---

[14]     This legal principle has been referred to as the "cat's paw" doctrine, deriving from an Aesop fable wherein a monkey induces a cat by flattery to extract roasting chestnuts from the fire—leaving the cat with nothing but burnt paws. (See *Reeves*, *supra*, 121 Cal.App.4th at  114, fn. 14.)  However, as explained in *Reeves*: "[W]hile the fable contemplates that the instrumentality has been duped or flattered into carrying out the will of the actuator, the concept here is broader:  Imputation of retaliatory animus will be justified by any set of facts that would permit a jury to find that an intermediary, for whatever reasons, simply carried out the will of the actuator, rather than breaking the chain of causation by taking a truly independent action." (*Id.* at pp. 114–115, fn. 14.)

unsuccessful in "obtaining information, documentation, *or confirmation from yourself or your manager to support or substantiate your absence from work*." (Italics added.)

Second, in his deposition, Sow admitted that he would "provide input" or "present the facts" for employee termination decisions. With regard to Ndiaye's termination, specifically, Sow admitted he did not tell Pawluk that Ndiaye had been providing doctor's notes substantiating his leave through July 31 and further conceded that he never telephoned or emailed Ndiaye during the entire time Ndiaye was on medical leave.[15]

In an apparent attempt to minimize Sow's involvement, respondent asserts that after Sow was informed by his administrative assistant that Aetna had never approved Ndiaye's leave, Sow contacted

---

[15] In his deposition, Sow testified that he became aware of Ndiaye's absence after he left on February 3, 2015, because the company received his doctor's note. Sow later testified the only way he knew Ndiaye began his leave of absence was when Aetna notified the company that they had sent some paperwork to Ndiaye, but had not heard back from him. When subsequently shown the February 12 email written by Ndiaye's manager, Youssef Salib, stating that Ndiaye was on medical leave through March 6, 2015, Sow acknowledged it was fair to assume that he knew at this point that Ndiaye was out on leave. Whether Sow was being evasive, dishonest, or merely lacking in recollection on these material points is the type of demeanor-based determination that lies squarely within a jury's province. (See *Binder v. Aetna Life Ins. Co.*, *supra*, 75 Cal.App.4th at p. 840.)

In addition, Francois testified that she did not call or ask someone to call or follow-up with Ndiaye because "the managers, they usually stay in communication with the employee." Air Canada's expectation that supervisors, like Sow, are in regular contact with their employees, Sow's admissions that he never called or emailed Ndiaye during Ndiaye's absence, and Ndiaye's evidence of his acrimonious history with Sow, further lend credence to the theory that Sow was the cause of Ndiaye's termination.

18

Air Canada's human Resources Department for instructions and "*human resources prepared a letter* for Sow to send to Ndiaye" and that on June 26, 2015, "Sow sent Ndiaye *the letter, prepared by human resources.*" (Italics added.) In his deposition, however, Sow acknowledged that on June 18, he received an email from Yasmine Francois with sample letters attached, stating that "you can modify as you see fit." Sow testified he may have used one of the samples and made some modifications to it.[16]

Finally, respondent points out that Francois testified that she was aware of Ndiaye's doctor's notes and, in her opinion, these would have been insufficient to substantiate his leave. Although Francois stated in her deposition, "I did see them" in regards to the physician notes (albeit without specifying any time frame), she also testified that she never discussed any physician notes with Pawluk, and that it was Pawluk who made the decision to terminate Ndiaye, not her. She further testified that she could not recall any input provided by other individuals present for the July 8 conference call with Pawluk—the day before he drafted the termination letter. In contrast, Ndiaye submitted evidence that Pawluk was *not* aware of his doctor's notes, and had been

---

[16]     Although the trial court sustained respondent's objection to the admission of the sample letters (presented as exhibits attached to a declaration by plaintiff's counsel), respondent did not object to Sow's deposition testimony regarding these same letters. (Cf. *Miller v. Department of Corrections*, *supra,* 36 Cal.4th at p. 452, fn. 3 [noting defendant's hearsay objection to statement made in plaintiff's declaration was insufficient to preserve any hearsay objection to deposition testimony reciting same statement].)

told by Sow that Ndiaye had not provided *any* documentation or information in support of his disability leave—or communicated with anyone at Air Canada.

Based on the above, Ndiaye presented sufficient evidence to raise a triable issue whether Sow's actions were a causal factor in Pawluk's decision to terminate Ndiaye—thereby allowing any discriminatory motive on the part of Sow to be imputed to Air Canada for liability under FEHA. (*Reeves, supra,* 121 Cal.App.4th at p. 116.)

B.  *Ndiaye Presented Sufficient Evidence from Which a Jury Could Conclude that Air Canada's Proffered Reason for his Termination was Pretext*

The trial court concluded that Ndiaye had failed to present evidence "to raise even the inference that his termination was due to his . . . religion, race, ethnicity, or disability" and had "only submitted a scintilla of evidence with respect to pretext." We disagree.

If the employer has met its burden by showing a legitimate reason for its conduct, the employee must demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action. (*Batarse v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 820, 834 (*Batarse*).)

A plaintiff may establish pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer

20

or indirectly by showing that the employer's proffered explanation is unworthy of credence. (*Batarse, supra,* 209 Cal.App.4th at p. 834.) "'Pretext may be demonstrated by showing ". . . that the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate the discharge."'" (*California Fair Employment & Housing Com. v. Gemini Aluminum Corp.* (2004) 122 Cal.App.4th 1004, 1023.) Additionally, "'[p]retext may also be inferred from the timing of the company's termination decision, by the identity of the person making the decision, and by the terminated employee's job performance before termination.'" (*Ibid.*)

Air Canada's proffered reason—i.e., Ndiaye's failure to comply with leave procedures with respect to submitting documentation to third party insurer Aetna—is facially unrelated to prohibited bias. (*Guz, supra,* 24 Cal.4th at p. 358.) The burden thus shifted to Ndiaye to produce evidence that Air Canada's reason was a mere pretext for discrimination. (*Id.* at p. 360.)

Ndiaye contends that his acrimonious history with Sow and substantial compliance with leave procedures, in conjunction with other circumstantial evidence, is sufficient to withstand summary judgment. We agree. Ndiaye presented the following evidence in opposition to the summary judgment motion.

First, Ndiaye presented evidence of discriminatory animus on the part of Sow. Sow had previously disciplined Ndiaye for taking authorized medical leave and falsely disciplined him for "insubordination." At the time of his termination, Ndiaye was on

21

medical leave, caused by stress and anxiety from Sow's conduct. Ndiaye also presented evidence that Sow had previously made noxious statements towards Wolof Senegalese in front of Ndiaye, including a statement that if Sow were President of Senegal, he would have all Wolof people "executed." While respondent dismisses these remarks as "stray comments," "[d]etermining the weight of discriminatory or ambiguous remarks is a role reserved for the jury." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 540–541 [rejecting rigid-view "stray remarks doctrine" in favor of fact-specific assessment].)

Second, Ndiaye presented evidence that Air Canada's proffered reason—that Ndiaye refused to submit documentation supporting his leave of absence to Aetna—did not actually motivate his discharge, and that Ndiaye was, instead, terminated based on false information provided by Sow. (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 479; see also *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 147 [noting proof that the defendant's explanation is unworthy of credence is a form of circumstantial evidence that is probative of intentional discrimination and is "quite persuasive"].)

To the extent respondent argues that Ndiaye demonstrated his lack of compliance by "refus[ing]" to allow Aetna to open a claim on his behalf, a jury could find otherwise. Sow's June 26, 2015 letter does not, at any point, instruct Ndiaye to open or initiate a claim, but states only that he must "provide Aetna with completed documentation in support of [his] existing condition" and will be terminated if he fails to "provide the required documentation substantiating [his] absence to Aetna." The

22

evidence is undisputed that Ndiaye *did* contact Aetna on July 2, 2015, and was informed that it is typically *the employer* who initiates the paperwork for a claim. In his deposition, Ndiaye testified that this was the reason that he did not himself initiate a claim. Moreover, the evidence shows that Ndiaye had previously taken extended medical leaves and submitted paperwork to Air Canada's third-party administrator without incident and that prior to Ndiaye's February 2015 leave, Air Canada changed its procedures, and began processing such employee requests "in house" through its own benefits team.

Third, in its summary judgment motion, and on appeal, respondent asserts that "Air Canada provided Ndiaye with a leave of absence of more than five months" (apparently referring to the period beginning February 3) and that he was terminated solely because he "failed to properly obtain *an extension of his leave* through Aetna" after he dropped off his June 8, 2015 doctor's note. (Italics added.) Yet the letters sent by Sow and Pawluk plainly state that Ndiaye was on "unapproved" absence since February 3 and that he was terminated for effectively abandoning his position from that date. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 [noting pretext may be shown by "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons"'"].)

23

Ndiaye's evidence that respondent's proffered reason for his termination is "not worthy of belief," in conjunction with the other circumstances he raises, constitutes sufficient evidence from which a jury could conclude that Air Canada's stated reason for Ndiaye's termination was pretext for unlawful discrimination.  In so concluding we "emphasize that our analysis is confined to evaluating inferences which *may*, but need not, be drawn from this record" and "[o]ur task must end with the conclusion that they are inferences a reasonable factfinder could draw."  (*Reeves, supra,* 121 Cal.App.4th at p. 121.)

Summary judgment should not have been granted in favor of respondent on Ndiaye's FEHA discrimination claim.


II.     *Summary Adjudication of the Retaliation Claims under FEHA and CFRA Was Error*

Ndiaye contends that the trial court erred in summarily adjudicating his retaliation claims under CFRA and FEHA, as pled within the third and seventh causes of action.  We agree.

"A plaintiff can establish a prima facie case of retaliation in violation of the CFRA by showing the following: (1) the defendant was a covered employer; (2) the plaintiff was eligible for CFRA leave; (3) the plaintiff exercised his or her right to take a qualifying leave; and (4) the plaintiff suffered an adverse employment action *because he or she exercised the right to take CFRA leave.*  [Citation.]"  (*Rogers v. County of Los Angeles* (2011) 198 Cal.App.4th 480, 491; *Avila v. Continental*

*Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1254, 1260; § 12945.2.)[17] "Once an employee has submitted a request for leave under the CFRA, the employer is charged with knowledge that the employee's absences pursuant to the leave request are protected, and may not thereafter take adverse employment action against the employee based upon— that is, 'because of'—those protected absences." (*Avila v. Continental Airlines, Inc., supra,* 165 Cal.App.4th at p. 1260.)

"Employees may establish a prima facie case of [FEHA] retaliation by showing that (1) they engaged in activities protected by the FEHA, (2) their employers subsequently took adverse employment action against them, and (3) there was a causal connection between the protected activity and the adverse employment action." (*Miller v. Department of Corrections, supra,* 36 Cal.4th at p. 472, citing *Flait v. North American Watch Corp., supra,* 3 Cal.App.4th at p. 476; see also *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*); § 12940.)

The trial court granted summary adjudication of Ndiaye's CFRA and FEHA retaliation causes of action for the same reasons it denied

---

[17] In its answering brief, respondent argues that it neither (1) *denied* Ndiaye CFRA leave, nor (2) retaliated against him for *taking* CFRA leave. However, in his opposition in the trial court, Ndiaye pointed out that he was "not making a claim for *denial* of CFRA leave, but rather a claim for discrimination and retaliation based on [taking] that leave" and he solely briefs the latter claim in this appeal. Accordingly, we limit our discussion to the retaliation claim and deem any other CFRA-based claims waived. (See *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1569 [arguments not raised in trial court are deemed forfeited on appeal].)

his discrimination claim, accepting respondent's assertion that it terminated Ndiaye for legitimate, not retaliatory reasons, and that Ndiaye failed to demonstrate that Sow was responsible for his termination.

This, too, was error, in light of our conclusion as to pretext. (*Yanowitz, supra,* 36 Cal.4th at p. 1062 [applying pretext test to FEHA retaliation claim]; cf. *Reeves, supra*, 121 Cal.App.4th at p. 100 ["so long as the supervisor's retaliatory motive was an actuating, but-for cause of the dismissal, the employer may be liable for retaliatory discharge"]; cf. *Avila, supra,* 165 Cal.App.4th at p. 1258 [noting both FEHA and CFRA retaliation claims require causal link between employee's protected status or conduct and the adverse employment action taken by employer].)[18]

Likewise, in light of our Supreme Court's observation that "Retaliation claims are inherently fact-specific, and the impact of an employer's action in a particular case must be evaluated in context. . . . [T]he determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the

---

[18] In support of its conclusion that Air Canada had a legitimate reason for terminating Ndiaye, and acted without retaliatory motive, the trial court also observed that respondent had previously granted Ndiaye medical leave and that Ndiaye was offered the opportunity to submit a shift bid during his instant leave of absence. Thus, reasoned the trial court, "[Ndiaye] had no reason to believe that [respondent] was intending to terminate his employment." However, these facts support Ndiaye's assertion that but for Sow's intervention and/or exploitation of the situation—and false reporting of facts—Ndiaye would not have been terminated. These facts do not render Ndiaye's claims non-triable.

unique circumstances of the affected employee as well as the workplace context of the claim." (*Yanowitz, supra,* 36 Cal.4th at p. 1052.)

That context and those unique circumstances are discussed in detail above, including the lengthy history of acrimony between Sow and Ndiaye and evidence of Sow's retaliatory conduct with regards to Ndiaye's use of sick leave—including medical absences taken by Ndiaye due to the stress and anxiety allegedly caused by Sow's conduct and treatment of Ndiaye.

We therefore reverse the trial court's grant of summary judgment in favor of respondent on Ndiaye's CFRA and FEHA retaliation claims, contained in his third and seventh causes of action.

III.    *Summary Adjudication of the Failure to Prevent Discrimination and Retaliation Claim Was Error*

"The employer's duty to prevent harassment and discrimination is affirmative and mandatory." (*Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.* (2002) 103 Cal.App.4th 1021, 1035.) Ndiaye's sixth cause of action alleged breach of that duty, and he has renewed the claim on appeal.

Respondent's motion sought summary adjudication on the sole basis that there was no discrimination or retaliation, which the trial court granted. In light of our conclusions regarding discrimination and retaliation, the trial court's grant of summary judgment on this cause of action must also be reversed. (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 288 [concluding same].)

27

IV.    *The Summary Adjudication of the Reasonable Accommodation and Interactive Process Claim under FEHA was Error*

Under the FEHA it is an unlawful employment practice for an employer "to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee" (§ 12940, subd. (m)(1)), and, similarly "to fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee." (§ 12940, subd. (n).) Ndiaye's fourth and fifth causes of action sought liability on these bases, and he renews these claims in this appeal.

Although a claim of failure to accommodate is independent of a cause of action for failure to engage in an interactive dialogue, each necessarily implicates the other. (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 54 (*Gelfo*).) Moreover, "a finite leave of absence has been considered to be a reasonable accommodation under [FEHA], provided it is likely that following the leave, the employee would be able to perform his or her duties." (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 226.)

The trial court found Ndiaye's causes of action for failure to provide a reasonable accommodation and engage in an interactive process failed because Air Canada provided him with a reasonable accommodation in the form of an extended leave of absence and then reasonably, and in good faith, asked him to substantiate his leave, which he failed to do.

28

While it is true that responsibility for the breakdown lies with the party who fails to participate in good faith (*Gelfo, supra,* 140 Cal.App.4th at p. 54), liability hinges on the objective circumstances surrounding the parties' breakdown in communication. (*See ibid.*) As demonstrated by our discussion, the factual circumstances surrounding Ndiaye's request for accommodation via extended leave, and the process surrounding that request, are subject to reasonable dispute and therefore not appropriate for summary adjudication. (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 374 ["The reasonableness of an accommodation generally is a question of fact"]; see *A.M. v. Albertsons, LLC* (2009) 178 Cal.App.4th 455, 464–465 [a single failure to reasonably accommodate an employee may give rise to liability, despite other efforts at accommodation].)

Accordingly, we reverse the trial court's grant of summary judgment on Ndiaye's fourth and fifth causes of action, for failure to provide a reasonable accommodation and to engage in the interactive process.[19]

---

[19] In the trial court, respondent also sought summary adjudication on the issue of punitive damages, noting that Sow was dismissed from the action, and arguing there was no evidence any others with Air Canada acted with malice, oppression or fraud. In its order granting summary judgment, the trial court concluded that punitive damages were unwarranted in light of its disposition of the underlying claims.

On appeal, respondent argues that Ndiaye has waived any claim to punitive damages by failing to address the issue in his opening brief. Ndiaye does not respond to this assertion in his reply brief, and we accordingly conclude that Ndiaye has waived any claim to punitive damages on his causes of action. (See *Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 89–90 [concluding appellants made an implicit concession by "failing to

## DISPOSITION

The judgment in respondent's favor on Ndiaye's first, third, fourth, fifth, sixth, and seventh causes of action is reversed. The judgment is affirmed in all other respects.

Appellant is entitled to costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                               WILLHITE, J.

We concur:


MANELLA, P. J.


CURREY, J.

---

respond in their reply brief to the [respondent's] argument on [that] point"]; cf. *Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 951 [appellate court reviews trial court's ruling, not reasoning, on review of summary adjudication].)