Filed 5/27/26  Simon Property Group v. RWF Holdings CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SIMON PROPERTY GROUP, L.P., Plaintiff and Appellant, v. RWF HOLDINGS, INC., et al., Defendants and Respondents. | B347126 Los Angeles County Super. Ct. No. 22STCV34489 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert B. Broadbelt, III, Judge. Reversed and remanded.

Baker & Hostetler, David J. Richardson, Alex E. Spjute, and Michael Patrick Brown for Plaintiff and Appellant.

Akerman, Michael R. Weiss and Benjamin R. Joelson for Defendants and Respondents.

_____

Plaintiff Simon Property Group, L.P. (Simon) appeals the trial court's grant of summary judgment on its complaint against RWF Holdings, Inc. (RWF), Meir Levin, and Mark Mintz (collectively, the Defendants) asserting causes of action for (1) violation of the Uniform Voidable Transactions Act (UVTA; Civ. Code,[1] §§ 3439–3440); and (2) conspiracy to commit a fraudulent transfer. Though named as an additional defendant in the complaint, L & M Footwear, Inc. (L&M) neither sought nor was awarded summary judgment.[2]

We reverse the judgment. The record does not show Defendants satisfied their burden of production to make a prima facie showing as to the nonexistence of any triable issue of material fact. In particular, we agree with Simon that Defendants failed to introduce evidence of the value of all the property involved in the allegedly fraudulent transfer. Without this, Defendants could not meet their burden on the dispositive issue of L&M's lack of equity in that property.

### BACKGROUND

Defendants Meir Levin and Mark Mintz were the sole shareholders of L&M and are the sole shareholders of Defendant RWF.

Levin and Mintz founded L&M in the 1990's. L&M operated as a footwear and apparel retailer for approximately 30 years, initially through brick-and-mortar stores and later online as well.

---

[1] Undesignated statutory references are to the Civil Code.

[2] The trial court had earlier entered default as to L&M. Simon did not pursue a default judgment against L&M.

Prior to the COVID-19 pandemic, L&M operated approximately 70 retail stores and had over $100 million in annual sales. More than 40 of its retail stores were at shopping malls owned by affiliates of Simon.

The COVID-19 pandemic severely affected L&M's operations. L&M determined to close all but one of its retail stores and reposition itself primarily as an online footwear retailer. It stopped paying rent to Simon. Simon sued L&M in several state courts for unpaid rent.

While Simon's state court proceedings were pending, on August 1, 2022, L&M made a "general assignment for the benefit of [L&M's] creditors" (the Assignment) as such term is defined in Code of Civil Procedure section 493.010. The transfer was of all of its assets to assignee Insolvency Services Group, Inc. (ISG).

The same day, immediately after ISG accepted the Assignment, ISG and RWF entered into and consummated an asset purchase agreement (APA) whereby RWF bought substantially all the assets L&M had just assigned to ISG. The purchased assets are described as all assets falling within 22 different categories listed in a schedule to the APA. One such category is assumed contracts, which are individually listed on a different schedule. Among these 20 scheduled assumed contracts are three real property leases under which L&M was a tenant. Two of these leases were of properties owned by Levin and Mintz. The third concerned property owned by Montebello Town Center Investors, LLC.

The consideration for RWF's purchase was estimated at $3.622 million, comprising cash and the assumption of debt. The cash component was only $125,000. Included in the assumed debt was approximately $3.373 million in debt secured by

substantially all of L&M's assets. L&M's secured debt was composed of the following loans (balances as of the date of the Assignment): (1) from QVE Holdings, LLC (owned by Levin and Mintz), with an outstanding balance of $1,103,000; (2) from the United States Small Business Administration (personally guaranteed by Levin and Mintz), with an outstanding balance of $2,029,406; and (3) from Amazon Capital Services, Inc., with an outstanding balance of $240,853.

In short, after these two transactions, RWF held all, or substantially all, the assets previously held by L&M but agreed to take on only some of L&M's debts. The vast majority, by amount, of L&M's debts RWF assumed were either (i) owed to an entity Levin and Mintz owned; or (ii) personally guaranteed by Levin and Mintz. Disfavored unsecured creditors like Simon were left to look to the Assignment estate for satisfaction of their claims against L&M. It does not appear the Assignment resulted in meaningful, if any, distributions to these creditors. After the Assignment was made, Simon obtained judgments against L&M in five different states in the aggregate face amount of more than $16.6 million.

Immediately after the Assignment was made, RWF operated its assets in substantially the same way L&M had immediately beforehand, and there was no interruption in the business. For example, RWF operated out of the same principal place of business L&M had, used the same trade name and warehouse L&M had used, was owned by Levin and Mintz in the same proportions that they had owned L&M, and employed at least 42 out of the 44 employees L&M did the day before the Assignment.

In October 2022, Simon filed a complaint against Defendants and L&M, thereby commencing the present action. The complaint contained two causes of action in the caption and under separate headings: (1) violation of the UVTA; and (2) conspiracy to commit a fraudulent transfer. No cause of action for alter ego or successor liability was similarly listed. Nevertheless, Simon's prayer for relief sought a declaration that RWF is a successor to, and alter ego of, L&M, and RWF is therefore liable on Simon's state court judgments against L&M.

Defendants demurred to the complaint. Among other things, and even though Simon had not separately headed any such causes of action, they argued "Simon does not, and cannot, state a claim for successor or alter ego liability." Simon responded in opposition that "Defendants' purported 'demurrer' to alter ego and successor liability is improper [because] neither is a separate cause of action and thus, not properly subject to demurrer." (Citing Code Civ. Proc., § 430.50, subd. (a).) In overruling the demurrer in June 2023, the trial court adopted this logic: "Defendants have demurred, 'to the extent it is considered a separate cause of action[,] [Simon]'s claim for alter ego liability.' . . . This is not a separate cause of action, and therefore may not be the basis of a demurrer." Defendants answered the complaint.

Several months later, Defendants moved for summary judgment, which the trial court granted after a hearing. Although Defendants tell us in their respondents' brief that we have "numerous alternative grounds for affirming," they argue none of them on appeal, instead incorporating by reference portions of the summary judgment record in the trial court. We therefore describe here only the facts relating to the ground relied upon by

the court, which is the sole basis for affirmance Defendants actually argue in their respondents' brief.

The trial court granted summary judgment on Simon's two causes of action on a single ground: Defendants had made a prima facie evidentiary showing, which Simon failed to rebut, that the value of the assets L&M transferred was less than the value of the debt secured by those assets. As such, the Assignment did not amount to a transfer of "assets" within the meaning of section 3439.01, subdivision (a). (See *id.*, subd. (a)(1).) This conclusion rested on a report prepared by B. Riley Advisory Services (B. Riley) for ISG in July 2022. It is a valuation of "certain personal property" of L&M as of May 23, 2022. We discuss the B. Riley report in greater detail below. Though Simon disputed the valuation methodologies B. Riley relied upon and offered evidence and argument the report concerned only a subset of L&M's assets, Simon did not offer a competing valuation.

Shortly before the summary judgment hearing, Simon filed a motion to amend its complaint. The purposes of its proposed amendments were "to add one cause of action for enforcement of judgments against an alter ego defendant or under a successor liability theory, and to update facts concerning Simon's state court judgments against L&M, including in Texas, Arizona, Florida, Nevada, and California." A hearing on Simon's motion to amend was set for after the scheduled summary judgment hearing.

The trial court granted Defendants' motion for summary judgment on Simon's unamended initial complaint. As part of the court's order, it advanced and vacated the hearing on Simon's motion to amend its complaint.

The trial court later entered judgment against Defendants. Simon timely appealed.

## DISCUSSION

### I. Summary Judgment and Standard of Review

"A defendant's motion for summary judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) The burden of persuasion remains with the party moving for summary judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 861 [(*Aguilar*)].)" (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002–1003 (*Kahn*).)

"When the defendant moves for summary judgment, in those circumstances in which the plaintiff would have the burden of proof by a preponderance of the evidence, the defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence.' " (*Kahn*, *supra*, 31 Cal.4th at pp. 1002–1003.)

If a defendant fails to meet this initial burden, the motion must be denied. (*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 840 (*Binder*).) If the defendant meets this initial burden, however, the burden shifts to the plaintiff to establish, by means of competent and admissible evidence, a triable issue of material fact remains. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra,* 25 Cal.4th at pp. 850–851.)

"On appeal from the granting of a motion for summary judgment, we examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) This requires us to draw from the evidence all reasonable inferences in favor of the nonmoving party. (*Id.* at p. 470.)

## II. Analysis

### A. UVTA and Conspiracy Causes of Action

Under the UVTA, a transfer made by a debtor is voidable as to a creditor if the debtor made the transfer (1) with the intent to defraud its creditors; or (2) without receiving reasonably equivalent value in exchange at a time when the debtor was unreasonably undercapitalized or equitably insolvent. (§ 3439.04, subd. (a).) For these purposes, "[t]ransfer" means parting with any interest in an asset. (§ 3439.01, subd. (m).) And while the definition of "[a]sset" generally embraces anything a debtor may own (*id.*, subds. (a), (j)), it does not include property of the debtor "to the extent it is encumbered by a valid lien" (*id.*, subd. (a)(1)). Thus, the UVTA applies only to transfers of property in which the debtor had some equity. (See *Fidelity National Title Ins. Co. v. Schroeder* (2009) 179 Cal.App.4th 834, 841, 843.)

For the reasons that follow, we conclude Defendants failed to show an absence of triable facts relating to L&M's lack of equity in the property it transferred. As such, the trial court improperly granted summary adjudication on Simon's UVTA cause of action and related conspiracy cause of action. Summary judgment was therefore improper.

8

### 1. Defendants Failed to Produce Evidence L&M Lacked Equity in All Its Property

The trial court concluded L&M lacked equity in the property it assigned to ISG—all of its property—because the $3.373 million in debts secured by that property as of the Assignment date exceeded any value B. Riley placed on it in its July 2022 report. The report contained two different estimates of value: $2,487,116 under a "fair market value" approach; and $1,773,380 under a "forced liquidation" approach. B. Riley did not value L&M's assets as a going concern, even though L&M was operating and even though the Assignment was specifically intended "to preserve the value of the assets [as] an ongoing business."

Simon contends the trial court's conclusion was wrong for at least two reasons. First, B. Riley should have valued L&M's assets as a going concern as a matter of law because RWF continued to operate them as a going concern after the transaction. Second, B. Riley's report failed to address all of L&M's assets.

We need not consider the question of valuation methodology because, when construed in the light most favorable to Simon, the B. Riley report did not address all L&M's assets. We therefore conclude the trial court erred in ruling the B. Riley report satisfied Defendants' burden to establish the value of all the property L&M transferred.

First, the B. Riley report, on its face, did not purport to address all L&M's assets. Instead, it valued "certain personal property . . . held by L&M." Drawing inferences from the word "certain" most favorable to Simon, the B. Riley report addressed only some of, and not all, L&M's property. (See *Bumb v.*

9

*McIntyre* (9th Cir. 1960) 277 F.2d 647, 650 ["It would appear that the word 'certain' has a number of different meanings, and its meaning in a particular case depends upon the context in which the word is used. If the words used were 'certain of the' it might mean 'some of the.' If the words used were 'those certain' or 'all that certain' it might mean 'precise,' 'definite,' or 'ascertained' property."].) The reasonableness of this inference is buttressed by the statement in B. Riley's engagement letter that "[a]ny assets or liabilities not identified [therein] w[ould] be excluded from the [v]aluation." Moreover, even if the word "certain" is not independently limiting, the report's express limitation to "personal property" means L&M's real property leases, though referenced in the report, were excluded from the valuation.

Second, the description of the personal property B. Riley did value reinforces the inference that not all L&M's valuable personal property was included. The report valued "two vehicles, two forklifts, several manual and electric pallet jacks, warehouse and retail store racking, furniture & fixtures, leasehold improvements, signage, and inventory." Comparing this list of categories to the APA's 22 categories of assets RWF bought from ISG, the inference favorable to Simon is that several categories of assets were excluded. This is true even accounting for the statement in the B. Riley report that L&M's trade name, domain names, and Amazon seller accounts (each of which RWF was careful to include in its acquisition) had no material value under B. Riley's chosen valuation methodologies.

Third, and in any event, we need not rely on inference to know B. Riley did not value all L&M's valuable personal property. Defendants do not dispute the appraisal excluded tax credits. Indeed, one of Defendants' summary judgment witnesses

declared in support of the motion that "a tax refund asset . . . was not included in the scope of the B. Riley appraisal." ISG's notice to creditors reflects that RWF purchased a federal Employee Retention Tax Credit receivable assigned from L&M worth $410,792.

On this basis, we conclude Defendants simply did not offer evidence of the value of all the property L&M transferred to ISG.[3] Accordingly, they did not meet their initial burden of presenting evidence that would preclude a reasonable factfinder from finding that property was worth less than the debt it secured.

In reaching this conclusion, we disagree with the trial court's assessment of Simon's argument below that B. Riley's appraisal failed to address all L&M's assets. First, the court said Simon had not materially disputed B. Riley's "calculat[ions]," characterizing a response to Defendants' statement of undisputed facts as "not disputing that B. Riley conducted an appraisal of L&M's assets." But what Simon actually said was that it "[d]isputed that the appraisal valued 'L&M's assets,' given its limited coverage." Simon repeatedly made clear its position the B. Riley report was underinclusive on its face. "[A] plaintiff can defeat a defense motion for summary judgment by showing . . . the defense evidence itself permits conflicting inferences as to the existence of the specified fact . . . ." (*Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749, 756–757.)

---

[3]     At oral argument, Defendants argued they submitted declarations and other evidence reaching the same value conclusion the B. Riley report did. All of this evidence refers back to the B. Riley report and is therefore inadequate for the same reasons the B. Riley report is.

Second, the trial court incorrectly addressed Simon's assertion that B. Riley omitted to value tax credits. The court found Simon should have offered a declaration that B. Riley should have, but did not, value them. However, Defendants could not meet their burden of production on the issue of lack of equity in L&M's property without offering evidence of the gross value of *all* its property. Again, a plaintiff opposing summary judgment has no evidentiary burden if the defendant has failed to satisfy its initial burden of production. (*Binder, supra*, 75 Cal.App.4th at p. 840.)

Third, the trial court said Simon's citation in its opposition just to the "appraisal summary" was not sufficient to show the appraisal did not value contract rights. But Simon's citation was also to the full B. Riley report, and that report shows B. Riley did not value contract rights that L&M had. As already noted, the B. Riley report is expressly limited to personal property but it recognizes L&M owned real property leases. These same leases are among those "contracts" RWF assumed under the APA.

Simon also pointed to evidence extrinsic to the B. Riley report to show it was underinclusive. It noted L&M's financial statements showed, as of December 31, 2021, L&M owned leasehold improvements with a book value of $2,350,738. These accounted for more than half the balance sheet value of L&M's assets. But the B. Riley report, which valued L&M's assets as of May 23, 2022, ascribes no value to leasehold improvements. Though the report says leasehold improvements are among several categories of personal property that were the subject of the valuation, and though the report mentions leasehold improvements as one of several "[m]ajor assets" B. Riley valued under the indirect cost approach, B. Riley's exhibits showing the

12

category-by-category valuations that sum to its ultimate value conclusions make no mention of leasehold improvements.

Particularly in light of other evidence the B. Riley report was incomplete, the reasonable inference favorable to Simon is that B. Riley, despite claiming to have valued L&M's leasehold improvements, omitted their value from the report. Instead of drawing this inference, the trial court construed the B. Riley report as "appear[ing] to show B. Riley did receive, consider, and analyze the leasehold improvement amount set forth in the 2021 financial statement, even if the exact amount of the leasehold improvement amount is not included in the appraisal summary." As Simon noted below, the problem is not that the appraised value of the leasehold improvements does not "exactly" match the financial statement; it's that leasehold improvements are not valued in the B. Riley report at all.

Though it is enough that the B. Riley report did not even attempt to address all L&M's property, the record contains evidence the omitted assets were, in fact, valuable. Again, the federal Employee Tax Retention Credit was worth at least $410,000. L&M's real property leases, though not specifically valued, also had value. This is apparent from the Assignment documents. The real property leases were expressly excluded from the initial assignment. However, they were ultimately sold by ISG to RWF. By the terms of the Assignment document, the only way this could have happened was that ISG first "determine[d] that [the leases] [could] be assigned and also that [they] *ha*[*d*] *realizable value* for [L&M's] creditors . . . ."[4] (Italics

---

[4] ISG made this determination remarkably quickly given that the APA was consummated the same day it was signed.

13

added.) And, while book value is not necessarily probative of actual value, L&M held leasehold improvements with a recent book value of $2,350,738 that were nowhere reflected in B. Riley's calculation of value as of a date less than five months later.

Defendants argue, in the alternative, they met their initial burden by showing Simon cannot establish an essential element of its cause of action. In support, they cite Simon's discovery responses on various topics, including Simon's failure to dispute the "[]accura[cy]" of the B. Riley report or provide any specifics regarding the "wrongful[ness] of ISG's conduct." But Defendants cite no discovery response establishing Simon cannot show L&M had some equity in the property it transferred to ISG. The B. Riley report can be both underinclusive and accurate as to the assets it did value.

Because we conclude Defendants, in relying on a valuation that did not address all L&M's property, did not meet their burden of production on the issue of lack of equity, we need not address the issue of valuation methodology. If presented with competing valuation methodologies at trial, the trial court will have to determine in the first instance which methodology is appropriate given the facts in this case. We need not express an opinion as to the court's analysis of that issue, other than to note that authority from other courts interpreting similar statutes and the United States Bankruptcy Code may be persuasive. (See *Mejia v. Reed* (2003) 31 Cal.4th 657, 664 (*Mejia*) [citing "decisions of other states construing parallel provisions of the [UVTA]"]; *Kirkland v. Risso* (1979) 98 Cal.App.3d 971, 977–978 [following decisions of other states in fraudulent transfer case]; *Hayes v. Palm Seedlings Partners-A* (*In re Agric. Research & Tech. Grp., Inc.*) (9th Cir. 1990) 916 F.2d 528, 534 [applying analogous

14

provisions of the U.S. Bankruptcy Code to a Hawaii state law fraudulent transfer claim].)

### 2. Defendants' Alternative Grounds for Affirmance Are Unpersuasive

Without identifying them, Defendants assert we have "numerous alternative grounds for affirming the Trial Court Order," followed by a bare citation to the first 15 pages of their summary judgment memorandum and the entirety of their summary judgment reply (inclusive of its proof of service). We will consider only those alternative arguments in the portion of the memorandum to which Defendants direct our attention. (See *Schram Construction, Inc. v. Regents of University of California* (2010) 187 Cal.App.4th 1040, 1052, fn. 7 [issue raised for first time in reply brief before trial court waived on appeal].)

Defendants first argued the transfer of L&M's assets cannot be fraudulent because "it was done pursuant to California law." A legal procedure for effecting a transfer is not a license to make a fraudulent transfer. (See *Mejia*, *supra*, 31 Cal.4th at p. 664 [legislative authorization for transfers pursuant to marital settlement agreements not "a one-time-only opportunity to defraud creditors by including [a] fraudulent transfer [therein]"].) The court in *Tatung Co. v. Shu Tze Hsu* (C.D.Cal. 2014) 43 F.Supp.3d 1036, 1069, confronted with the same argument Defendants make, "f[ound] no . . . authority or basis in the statutory text to hold that the [UVTA] is inapplicable to assignments for the benefit of creditors." Defendants offered no new authority below.

Defendants next argued Simon suffered no damages because L&M had no equity in its property. For the same reason we concluded summary judgment was inappropriate on the

15

ground that L&M transferred no "assets" as defined in the UVTA, summary judgment is also inappropriate on this ground.

Defendants next argued Simon's fraudulent transfer cause of action against Levin and Mintz fails because they neither personally transferred nor received any property in connection with the Assignment. As explained in *Potter v. Alliance United Insurance Co.* (2019) 37 Cal.App.5th 894, 910, "[t]he UVTA permits a creditor to recover against a transferee or a 'person for whose benefit the transfer was made.'" As such, the beneficiary of a fraudulent transfer, even if not the transferee, is a proper defendant. (*Ibid*.) Defendants' argument simply ignores this, as well as the fact that Levin and Mintz were the sole shareholders of L&M, are the sole shareholders of RWF, were personal guarantors of $2,029,406 in L&M debt that RWF assumed, and were owners of the lender on another $1,103,000 of such debt. Even if these facts are not conclusive to show Levin and Mintz were beneficiaries of the transfer, nothing in the record precludes a finding that they stood to benefit from it and the attendant preservation of L&M's former business reincarnated as RWF.

Finally, Defendants argued there can be no conspiracy liability in the absence of an underlying tort. As we reject the trial court's summary judgment on the underlying UVTA cause of action, we reject its judgment on the conspiracy cause of action as well.

### B.     Alter Ego and Successor Liability "Claims"

Defendants contend "the trial court decided Simon's alter ego and successor liability claims." We disagree. The only mention of those "claims" is in the introduction to the discussion section of the order: "Defendants . . . move the court for an order granting summary judgment in their favor and against [Simon]

16

on [Simon's] Complaint or, in the alternative, summary adjudication in their favor and against [Simon] on the first and second *causes of action* and the *claims* for alter ego and successor liability." (Italics added.) The order then proceeds, under separate headings, to address Simon's "first cause of action for voidable transfer" and "second cause of action for aiding, abetting, and/or conspiracy to commit fraudulent transfer." At the conclusion of each separately headed section, the order states that the court "grants [the] motion for summary adjudication as to [each] *cause of action*." Immediately after discussing the second cause of action, the order states "[t]he court has granted summary adjudication on each cause of action alleged against Defendants" and "therefore grants Defendants' motion for summary judgment."

We interpret the trial court's distinction between the "causes of action," which it discussed, and the "claims," which it did not, as the court deeming resolution of the latter unnecessary to the determination of the motion because each was only a "claim for damages" on the other causes of action within the meaning of Code of Civil Procedure section 437c, subdivision (f)(1). This is consistent with the court's determination earlier in the proceedings that " 'alter ego liability' . . . is not a separate cause of action." It would also explain why the court did not further discuss the "claims," having resolved the "causes of action" in Defendants' favor.

We therefore have no occasion to address the validity of those "claims."

## III. Simon's Motion to Amend

As part of its summary judgment order, the trial court advanced and vacated the hearing on Simon's motion to amend

17

its complaint to add a cause of action for judgment enforcement against an alter ego defendant or under a successor liability theory. As a result, the court never heard or decided Simon's motion. The only apparent justification for this was the court's conclusion summary judgment was warranted. As this was error, the court shall consider Simon's motion to amend on remand in the first instance.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion. Costs are awarded to Simon.

RICHARDSON, J.

WE CONCUR:

CHAVEZ, Acting P. J.

GOORVITCH, J.